

1  IGNACIA S. MORENO
   Assistant Attorney General
2  Environmental & Natural Resources Division
   STEVEN O'ROURKE
3  E-mail: steve.o'rourke@usdoj.gov
   Massachusetts Bar No.: 565493
4  Environmental Enforcement Section
   Environmental & Natural Resources Division
5  United States Department of Justice
   P.O. Box 7611, Washington, D.C. 20044-7611
6  Telephone: (202) 514-2779
   Attorneys for Plaintiff United States of America
7
8  EDMUND G. BROWN Jr.
   Attorney General of the State of California
9  J. MATTHEW RODRIQUEZ
   Chief Assistant Attorney General
   KEN ALEX
10 Senior Assistant Attorney General
   DON ROBINSON
11 Supervising Deputy Attorney General
   ANN RUSHTON State Bar No. 62597
12 E-mail: Ann.Rushton@doj.ca.gov
   Deputy Attorney General
13 300 South Spring Street, Suite 1702
   Los Angeles, CA 90013
14 Telephone: (213) 897-2608; Fax: (213) 897-2802
   Attorneys for Plaintiff Department of Toxic Substances Control
15
                  **UNITED STATES DISTRICT COURT**
16                **CENTRAL DISTRICT OF CALIFORNIA**
                       **WESTERN DIVISION**
17
18 UNITED STATES OF AMERICA and       )
   CALIFORNIA DEPARTMENT OF           )  CIV. NO. : 10 - 7056 ABC(LCx)
   TOXIC SUBSTANCES CONTROL,          )
19                                    )
           Plaintiffs,                )
20                                    )
        v.                            )  **CONSENT DECREE**
21 AIR DISTRIBUTION PRODUCTS, et      )
   al.,                               )
22         Defendants.                )
23
24
25
26
27
28

Priority  ——
Send      ——
Enter     ——
Closed    ——
JS-5/JS-6 ✓
JS-2/JS-3 ——
Scan Only ——

# I. BACKGROUND

A.    The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and the California Department of Toxic Substances Control ("Department"), filed a complaint in this matter pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9607, as amended ("CERCLA"), seeking reimbursement of response costs incurred or to be incurred for response actions taken or to be taken at or in connection with the release or threatened release of hazardous substances at the South El Monte Operable Unit (the "Site") of the San Gabriel Valley Area 1 Superfund Site in South El Monte, Los Angeles County, California.

B.    The Settling Defendants, as defined herein below, that have entered into this Consent Decree do not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the complaint.

C.    The decision by EPA on the remedial action to be implemented at the Site is embodied in an Interim Record of Decision ("IROD"), executed on September 29, 2000.  The IROD includes a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA.  The IROD is attached as Appendix A.

D.    EPA issued an Explanation of Significant Differences ("ESD") on November 10, 2005, addressing certain additional contamination treatment at the Site. The ESD is attached as Appendix B.

E.    The San Gabriel Basin Water Quality Authority ("WQA"), City of Monterey Park,  Golden State Water Company, and San Gabriel Valley Water Company (collectively, the "Water Entities") have agreed to perform the funded portions of the IROD Work and the ESD Work, subject to the terms and conditions of the executed agreement between EPA and WQA regarding the Water Entities' continued performance of this IROD Work and the ESD Work ("Cooperative

1 Agreement").

2   F.   EPA has projected the cost of the IROD Work and the ESD Work, and
3 has determined that the payments under this Consent Decree from the Settling
4 Defendants (other than the Ability-to-Pay Settling Defendants) are consistent with the
5 Settling Defendants' fair share of the total projected costs of the IROD Work and
6 ESD Work.

7   G.   The United States has reviewed the financial information submitted by
8 the Ability-to-Pay Settling Defendants to determine whether the Ability-to-Pay
9 Settling Defendants are financially able to pay response costs incurred, and to be
10 incurred, at the Site. Based upon this financial information, the United States has
11 determined that the Ability-to-Pay Settling Defendants are able to pay the amounts
12 required under this Consent Decree.

13   H.   The United States, the Department, and Settling Defendants agree, and
14 this Court by entering this Consent Decree finds, that this Consent Decree has been
15 negotiated by the Parties in good faith, that settlement of this matter will avoid
16 prolonged and complicated litigation among the Parties, and that this Consent Decree
17 is fair, reasonable, and in the public interest.

18   THEREFORE, with the consent of the Parties to this Decree, it is ORDERED,
19 ADJUDGED, AND DECREED:

20                        **II. JURISDICTION**

21   1.   This Court has jurisdiction over the subject matter of this action pursuant
22 to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. §§ 9607 and 9613(b) and also has
23 personal jurisdiction over Settling Defendants. Settling Defendants consent to and
24 shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter
25 and enforce this Consent Decree.

26                        **III. PARTIES BOUND**

27   2.   This Consent Decree is binding upon the United States, the Department,
28 and upon the Settling Defendants and their heirs, successors and assigns. Any change

1  in ownership or corporate or other legal status, including, but not limited to, any

2  transfer of assets or real or personal property, shall in no way alter the status or

3  responsibilities of Settling Defendants under this Consent Decree.

## IV.  DEFINITIONS

5    3.    Unless otherwise expressly provided herein, terms used in this Consent

6  Decree which are defined in CERCLA or in regulations promulgated under CERCLA

7  shall have the meaning assigned to them in CERCLA or in such regulations.

8  Whenever terms listed below are used in this Consent Decree or in any appendix

9  attached hereto, the following definitions shall apply:

10    a.    "Ability-to-Pay Settling Defendants" shall mean those Settling

11  Defendants identified in Appendix D (List of Settling Defendants and Defendant

12  Subgroup) as Ability-to-Pay Settling Defendants.

13    b.    "Basin-Wide Response Costs" shall mean response costs, including but

14  not limited to direct and indirect costs, including accrued Interest, of the United

15  States and the Department, paid for basin-wide (non-operable unit) response actions

16  in connection with the San Gabriel Valley Superfund Sites, Areas 1 though 4,

17  allocated to the Site.

18    c.    "CERCLA" shall mean the Comprehensive Environmental Response,

19  Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq.*

20    d.    "Consent Decree" shall mean this Consent Decree and all appendices

21  attached hereto.  In the event of conflict between this Consent Decree and any

22  appendix, this Consent Decree shall control.

23    e.    "Department" shall mean the California Department of Toxic Substances

24  Control and any successor departments, agencies, or instrumentalities.

25    f.    "Day" shall mean a calendar day.  In computing any period of time under

26  this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal

27  holiday, the period shall run until the close of business of the next working day.

28    g.    "DOJ" shall mean the United States Department of Justice and any

1  successor departments, agencies or instrumentalities of the United States.

2      h.    "EPA" shall mean the United States Environmental Protection Agency

3  and any successor departments, agencies or instrumentalities of the United States.

4      i.    "EPA Hazardous Substance Superfund" shall mean the Hazardous

5  Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

6      j.    "Explanation of Significant Differences" or "ESD" shall mean the

7  Explanation of Significant Differences relating to the treatment of certain

8  contamination at the Site, issued by EPA on November 10, 2005.

9      k.    "ESD Work" shall mean all activities that implement the additional

10  interim remedial measures described in the ESD. The "ESD Work" does not include

11  the "IROD Work."

12      l.    "Future IROD Response Costs" shall mean all response costs that are

13  incurred by the United States or the Department for response actions with respect to

14  the IROD Work (excluding Future ESD Response Costs) after the Effective Date,

15  including, but not limited to, direct and indirect costs that are incurred by the United

16  States or the Department.

17      m.    "Future ESD Response Costs" shall mean all response costs that are

18  incurred by the United States or the Department for response actions with respect to

19  the ESD Work (excluding Future IROD Response Costs) after the Effective Date,

20  including, but not limited to, direct and indirect costs that are incurred by the United

21  States or the Department.

22      n.    "Interim Record of Decision" or "IROD" shall mean the EPA Interim

23  Record of Decision relating to the Site signed on September 29, 2000 by the Regional

24  Administrator, EPA Region IX, or his/her delegate, and all attachments thereto.

25      o.    "IROD Work" shall mean all activities that implement the interim

26  remedy (addressing containment of the intermediate zone groundwater contamination

27  present in the northwestern part of the Site) described in the IROD. The "IROD

28  Work" does not include the "ESD Work."

1    p.    "Interest" shall mean interest at the rate specified for interest on

2  investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. §

3  9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C.

4  § 9607(a).  The applicable rate of interest shall be the rate in effect at the time the

5  interest accrues.  The rate of interest is subject to change on October 1 of each year.

6    q.    "Paragraph" shall mean a portion of this Consent Decree identified by an

7  Arabic numeral or an upper or lower case letter.

8    r.    "Parties" shall mean the United States, the Department, and the Settling

9  Defendants.

10    s.    "Past Response Costs" shall mean all response costs, including, but not

11  limited to, direct and indirect costs of the United States and the Department, paid at or

12  in connection with the Site through the Effective Date.  "Past Response Costs" shall

13  also include all past Basin-Wide Response Costs, occurring on or before the Effective

14  Date.

15    t.    "Plaintiffs" shall mean the United States and the Department.

16    u.    "RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. § 6901, *et*

17  *seq.* (also known as the Resource Conservation and Recovery Act).

18    v.    "Section" shall mean a portion of this Consent Decree identified by a

19  Roman numeral.

20    w.    "Settling Defendants" shall mean the parties identified in Appendix D.

21  Settling Defendants include "Ability-to-Pay Settling Defendants," as defined above,

22  as a Sub-Group. The term Settling Defendant is defined to include: (1) where the

23  Settling Defendant is a corporate entity, its officers, directors, shareholders, and

24  corporate successors; (2) where the Settling Defendant is a partnership, its partners;

25  (3) where the Settling Defendant is a trust, its trustees and beneficiaries; (4) where the

26  Settling Defendant is a limited liability company, its members and manager; (5)

27  where the Settling Defendant is an individual, that individual's heirs and

28  beneficiaries, but only to the extent that such person or entity within these above

-5-

1  categories has no independent liability for the Site other than liability derived from
2  the person or entity's relationship to or affiliation with the Settling Defendants.

3      x.    "Site" shall mean the South El Monte Operable Unit of the San Gabriel
4  Valley Area 1 Superfund Site, Los Angeles County, California, depicted generally on
5  the map attached as Appendix C.

6      y.    "United States" shall mean the United States of America, including its
7  departments, agencies and instrumentalities.

8      z.    "Water Entities" shall mean the San Gabriel Valley Water Quality
9  Authority, City of Monterey Park, Golden State Water Company, and San Gabriel
10  Valley Water Company.

11                **V. PAYMENT OF RESPONSE COSTS**

12      4.    Payments by the Settling Defendants. In consideration of the Covenants
13  contained in Section VII of this Consent Decree, Settling Defendants shall each pay
14  to Plaintiffs the sum set forth in the schedule attached as Appendix E for such Settling
15  Defendant. The payments set forth in Appendix E collectively total $2,007,095.00.
16  These settlement funds are allocated as follows: $1,731,345.00 to EPA and
17  $275,750.00 to the Department. The Department has agreed to receive $100,000.00 of
18  its allocation as a direct payment on account of its past costs at the Site, and to
19  contribute $175,750.00 of its allocation to the IROD Work and the ESD Work.
20  Therefore, within 30 days of the Effective Date of this Consent Decree, Settling
21  Defendants shall each pay to the Plaintiffs the sum set forth in Appendix E as such
22  Settling Defendant's payment to Plaintiffs, together with Interest accruing from the
23  date this Consent Decree is lodged with the Court, pursuant to payment instructions
24  which shall be forwarded to Settling Defendants with the Notice of Lodging of this
25  Consent Decree.

26      5.    All amounts to be paid to EPA pursuant to Paragraph 4 shall be
27  deposited in the South El Monte Operable Unit Special Account within the EPA
28  Hazardous Substance Superfund to be retained and used to conduct or finance

response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund. In consideration of its agreement that all amounts paid to EPA shall be so deposited and used, the Department is granted a credit pursuant to Section 104(c)(5)(A) of CERCLA, 42 U.S.C. § 9604(c)(5)(A) in the amount of $175,750.00, to be used by the Department in any manner permitted by Section 104(c)(5)(F) of CERCLA, 42 U.S.C § 9604(c)(5)(F).

6.     All Payments by any Settling Defendant to the EPA Hazardous Substance Superfund shall be made by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account in accordance with the current EFT procedures, referencing EPA Region IX and Site Spill ID Number 0927, and DOJ Case Number 90-11-2-354/5.  Payment shall be made in accordance with instructions provided to Settling Defendants by the Financial Litigation Unit of the U.S. Attorney's Office in the Central District of California following lodging of the Consent Decree.  Any payments received by the Department of Justice after 4:00 p.m. Eastern Time shall be credited on the next business day.

7.     At the time of payment, Settling Defendants shall send notice that payment has been made, to the United States, EPA and DOJ in accordance with Section XIV (Notices and Submissions).

8.     Payment by the Settling Defendants to the Department shall be made by check payable to the California Department of Toxic Substances Control and shall refer to the "San Gabriel Valley South El Monte Operable Unit."  The check should be sent to:

California Department of Toxic Substances Control
Attention: Accounting Unit
South El Monte OU, Project Code No. 300347
P.O. Box 806
Sacramento, California 95812-0806

At the time of payment, Settling Defendants shall send notice that payment has been made to the Department in accordance with Section XIII (Notices and Submissions).

## VI.  FAILURE TO COMPLY WITH CONSENT DECREE

9.    <u>Interest on Late Payments</u>.  If any Settling Defendant fails to make any payment under Paragraph 5 by the required due date, Interest shall continue to accrue on the unpaid balance through the date of payment.

10.    <u>Stipulated Penalties</u>.

a.    If any amounts due under Paragraph 4 are not paid by the required due date, the relevant Settling Defendant shall be in violation of this Consent Decree and shall pay, as a stipulated penalty, in addition to the Interest required by Paragraph 9, $200 per day that any payment is late.

b.    Stipulated penalties are due and payable within 30 days of the date of the demand for payment of the penalties by EPA or the Department.  All payments to EPA or the Department under this Paragraph shall be identified as "stipulated penalties." All payments to EPA under this Paragraph shall be made by certified or cashier's check made payable to "EPA Hazardous Substance Superfund." The check, or a letter accompanying the check, shall reference the name and address of the party(ies) making payment, the Site name, EPA Region IX, and Site Spill ID Number 0927, and DOJ Case Number 90-11-2-354/5, and shall be sent to:

> EPA Superfund
> US EPA
> Region 9
> Attn: Superfund Accounting
> P.O. Box 360863M
> Pittsburgh, PA 15251.

All payments to the Department under this Paragraph shall be made by check payable to the California Department of Toxic Substances Control and shall refer to the "San Gabriel Valley South El Monte Operable Unit." The check shall be sent to:

> California Department of Toxic Substances Control
> Attention: Accounting Unit
> South El Monte OU, Project Code No. 300347
> P.O. Box 806
> Sacramento, California 95812-0806

At the time of the payment, Settling Defendant shall send notice that payment

-8-

1   has been made, to the United States, EPA and DOJ and the Department in accordance
2   with Section XIII (Notices and Submissions).

3       c.      Penalties shall accrue as provided in this Paragraph regardless of
4   whether EPA or the Department has notified the Settling Defendants of the violation
5   or made a demand for payment, but need only be paid upon demand. All penalties
6   shall begin to accrue on the day after payment is due and shall continue to accrue
7   through the date of payment. Nothing herein shall prevent the simultaneous accrual
8   of separate penalties for separate violations of this Consent Decree.

9       11.     Payments made under this Section shall be in addition to any other
10  remedies or sanctions available to Plaintiffs by virtue of Settling Defendants' failure
11  to comply with the requirements of this Consent Decree.

12      12.     Notwithstanding any other provision of this Section, the United States or
13  the Department may, in their unreviewable discretion, waive payment of any portion
14  of the stipulated penalties that have accrued pursuant to this Consent Decree.
15  Payment of stipulated penalties shall not excuse the Settling Defendants from
16  payment as required by Section V or from performance of any other requirements of
17  this Consent Decree.

18              **VII. <u>COVENANT NOT TO SUE BY PLAINTIFFS</u>**

19      13.     <u>Covenant Not to Sue by the United States</u>.

20      a.      In consideration of the payments to be made pursuant to Section V of
21  this Consent Decree, and except as specifically provided in Section VIII (Reservation
22  of Rights by Plaintiffs), the United States covenants not to sue or to take
23  administrative action against Settling Defendants (other than the Ability-to-Pay
24  Settling Defendants) pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§
25  9606 and 9607(a), and Section 7003 of RCRA, 42 U.S.C. § 6973, for the IROD
26  Work, Past Response Costs, Future IROD Response Costs, the ESD Work, and
27  Future ESD Response Costs. This covenant not to sue is conditioned upon the
28  satisfactory performance by Settling Defendants of their obligations under this

1   Consent Decree. This covenant not to sue extends only to Settling Defendants (other

2   than Ability-to-Pay Settling Defendants) and does not extend to any other person.

3        b.    In consideration of the payments to be made pursuant to Section V of this

4   Consent Decree, and except as specifically provided in this Paragraph, the United

5   States covenants not to sue or to take administrative action against the Ability-to-Pay

6   Settling Defendants pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§

7   9606 and 9607(a), and Section 7003 of RCRA, 42 U.S.C. § 6973, with regard to all

8   response actions taken or to be taken and all response costs incurred or to be incurred

9   at or in connection with the Site, by the United States or any other person. This

10  covenant not to sue is conditioned upon the satisfactory performance by Ability-to-

11  Pay Settling Defendants of their obligations under this Consent Decree including, but

12  not limited to, payment of all amounts due by them under Section V (Payment of

13  Response Costs) and Paragraphs 9 and 10 of Section VI (Interest and Stipulated

14  Penalties). This covenant not to sue is also conditioned upon the veracity and

15  completeness of any financial information previously provided to EPA by Ability-to-

16  Pay Settling Defendants. If any such financial information is subsequently determined

17  by EPA to be false or, in any material respect, inaccurate, the submitting Ability-to-

18  Pay Settling Defendant shall forfeit all payments made pursuant to this Consent

19  Decree and this covenant not to sue and the contribution protection provided to the

20  Ability-to-Pay Settling Defendants in Section X of this Consent Decree shall be null

21  and void. Such forfeiture shall not constitute liquidated damages and shall not in any

22  way foreclose the right of the United States to pursue any other causes of action

23  arising from Ability-to-Pay Settling Defendants' false or materially inaccurate

24  information.

25       14.   Covenant Not to Sue by the Department. Except as specifically provided

26  in Section VIII (Reservation of Rights by Plaintiffs), the Department covenants not to

27  sue or to take administrative action against Settling Defendants pursuant to Section

28  107(a) of CERCLA, 42 U.S.C. § 9607(a), or Health and Safety Code Sections

-10-

1   25355.5, 25360, and 25323.5 for the IROD Work, Past Response Costs, and Future

2   IROD Response Costs, the ESD Work, and Future ESD Response Costs. This

3   covenant not to sue is conditioned upon the satisfactory performance by Settling

4   Defendants of their obligations under this Consent Decree.  This covenant not to sue

5   extends only to Settling Defendants and does not extend to any other person. As to

6   Ability-to-Pay Settling Defendants, this covenant not to sue is also conditioned upon

7   the veracity and completeness of any financial information previously provided to

8   EPA by Ability-to-Pay Settling Defendants. If any such financial information is

9   subsequently determined by EPA or the Department to be false or, in any material

10  respect inaccurate, the submitting Ability-to-Pay Settling Defendant shall forfeit all

11  payments made pursuant to this Consent Decree and this covenant not to sue and the

12  contribution protection provided to the Ability-to-Pay Settling Defendants in Section

13  X of this Consent Decree shall be null and void. Such forfeiture shall not constitute

14  liquidated damages and shall not in any way foreclose the right of the Department to

15  pursue any other causes of action arising from Ability-to-Pay Settling Defendants'

16  false or materially inaccurate information.

17  ### VIII.  RESERVATION OF RIGHTS BY PLAINTIFFS

18          15.     The United States and the Department reserve, and this Consent Decree

19  is without prejudice to, all rights against Settling Defendants with respect to all

20  matters not expressly included within the Covenants Not to Sue by United States and

21  the Department in Paragraphs 13 and 14.  Notwithstanding any other provision of this

22  Consent Decree, the United States and the Department reserve all rights against

23  Settling Defendants (other than Ability-to-Pay Settling Defendants), and all rights

24  other than those set out in subsection (g) against Ability-to-Pay Settling Defendants

25  with respect to:

26          a.      liability for failure of Settling Defendants to meet a requirement of this

27  Consent Decree;

28          b.      criminal liability;

1    c.    liability for damages for injury to, destruction of, or loss of natural

2    resources, and for the costs of any natural resource damage assessments;

3    d.    liability, based upon Settling Defendants' ownership or operation of the

4    Site, or upon Settling Defendants' transportation, treatment, storage, or disposal, or

5    the arrangement for the transportation, treatment, storage, or disposal, of a hazardous

6    substance or a solid waste at or in connection with the Site, occurring after signature

7    of this Consent Decree by Settling Defendants;

8    e.    liability arising from the past, present, or future disposal, release or

9    threat of release of a hazardous substance, pollutant, or contaminant outside of the

10   Site;

11   f.    liability for performance of response action or for reimbursement of

12   response costs with respect to any other operable unit of the San Gabriel Valley

13   Superfund Site, including but not limited to the response costs at the Whittier

14   Narrows Operable Unit; and

15   g.    liability for performance of response action or for reimbursement of

16   response costs with respect to any response actions selected in any future response

17   action decision documents for the Site, which response actions are different from the

18   activities required to implement the IROD Work or the ESD Work.

19   **IX. COVENANT NOT TO SUE BY SETTLING DEFENDANTS**

20   16.   Settling Defendants covenant not to sue and agree not to assert any

21   claims or causes of action against the Plaintiffs or their contractors or employees,

22   with respect to the IROD Work, Past Response Costs, Future IROD Response Costs,

23   the ESD Work, and Future ESD Response Costs or this Consent Decree. The Ability-

24   to-Pay Settling Defendants also covenant not to sue and agree not to assert any claims

25   or causes of action against the Plaintiffs or their contractors or employees, with

26   respect to the Site. The covenants in this Paragraph include but are not limited to:

27   a.    any direct or indirect claim for reimbursement from the Hazardous

28   Substance Superfund based on Sections 106(b)(2), 107, 111, 112, or 113 of

-12-

1 CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other

2 provision of law;

3      b.     any claim arising out of response actions in connection with the IROD

4 Work, Past Response Costs, Future IROD Response Costs, the ESD Work, and

5 Future ESD Response Costs, including any claim under the United States

6 Constitution, the California Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal

7 Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

8      c.    any claim against the Plaintiffs pursuant to Sections 107 and 113 of

9 CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the IROD Work, Past Response

10 Costs, Future IROD Response Costs, the ESD Work, and Future ESD Response

11 Costs. These covenants not to sue shall not apply in the event the United States or the

12 Department brings a cause of action or issues an order pursuant to the reservations set

13 forth in Paragraph 15(c)-(g), but only to the extent that Settling Defendants' claims

14 arise from the same response action or response costs that the United States or the

15 Department is seeking pursuant to the applicable reservation.

16     17.     Nothing in this Consent Decree shall be deemed to constitute approval or

17 preauthorization of a claim within the meaning of Section 111 of CERCLA, 42

18 U.S.C. § 9611, or 40 C.F.R. 300.700(d).

19     18.     Settling Defendants agree not to assert any claims and to waive all

20 claims or causes of action (including but not limited to claims or causes of action

21 under Sections 107(a) and 113 of CERCLA) that they may have for the IROD Work,

22 Past Response Costs, Future IROD Response Costs, the ESD Work and Future ESD

23 Response Costs against any person. This waiver shall not apply with respect to any

24 defense, claim, or cause of action that a Settling Defendant may have against any

25 person if such person asserts a claim or cause of action relating to the Site against

26 such Settling Defendant.

27

28   **X.  EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION**

-13-

19.   Except as provided in Paragraph 18, nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree.  The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this Decree may have under applicable law. Except as provided in Paragraph 18, the Parties expressly reserve any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which they may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this Consent Decree diminishes the right of the United States or the Department, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

20.   The Parties agree, and by entering this Consent Decree this Court finds, that this settlement constitutes a judicially-approved settlement for purposes of Sections 113(f)(2) and 122(g)(7) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(g)(7) and that each Settling Defendant is entitled, as of the Effective Date, as defined in Paragraph 40, of this Consent Decree, to protection from contribution actions or claims as provided by Section 113(f)(2) and 122(g)(7) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(g)(7), or as may be otherwise provided by law,  for "matters addressed" in this Consent Decree. The "matters addressed" in this Consent Decree as to Settling Defendants (other than Ability-to-Pay Settling Defendants) are the IROD Work, Past Response Costs, and Future IROD Response Costs, the ESD Work and Future ESD Response Costs. The "matters addressed" as to the Ability-to-Pay Settling Defendants are all response actions taken or to be taken and all response costs incurred or to be incurred at or in connection with the Site by the United States

1  or by any other person. The "matters addressed" in this Consent Decree do not
2  include those response costs or response actions as to which the Plaintiffs have
3  reserved their respective rights under this Consent Decree (except for claims for
4  failure to comply with this Decree), in the event that the United States or the
5  Department asserts rights against Settling Defendants coming within the scope
6  of such reservations.

7      21.   Each Settling Defendant shall, with respect to any suit or claim
8  brought by it for matters related to this Consent Decree, notify EPA, DOJ, and
9  the Department in writing no later than 60 days prior to the initiation of such
10  suit or claim. Each Settling Defendant shall, with respect to any suit or claim
11  brought against it for matters related to this Consent Decree, notify EPA, DOJ,
12  and the Department in writing within 10 days of service of the complaint or
13  claim upon it. In addition, each Settling Defendant shall notify EPA, DOJ, and
14  the Department within 10 days of service or receipt of any Motion for Summary
15  Judgment, and within 10 days of receipt of any order from a court setting a case
16  for trial, for matters related to this Consent Decree.

17      22.   In any subsequent administrative or judicial proceeding initiated by
18  the Plaintiffs for injunctive relief, recovery of response costs, or other relief
19  relating to the Site, Settling Defendants shall not assert, and may not maintain,
20  any defense or claim based upon the principles of waiver, *res judicata*,
21  collateral estoppel, issue preclusion, claim-splitting, or other defenses based
22  upon any contention that the claims raised by the Plaintiffs in the subsequent
23  proceeding were or should have been brought in the instant case; provided,
24  however, that nothing in this Paragraph affects the enforceability of the
25  Covenant Not to Sue by Plaintiffs set forth in Section VII.

26              **XI. ACCESS AND INSTITUTIONAL CONTROLS**

27      23.   If the Site, or any facility at the Site, or any other property where
28  access and/or land/water use restrictions are needed to implement response

activities at the Site is owned or controlled by any Settling Defendant, such
Settling Defendant shall:

a. commencing on the date of lodging of this Consent Decree, provide the Plaintiffs and their representatives, including EPA, the Department, and their contractors, with access at all reasonable times to the Site, or such other property, for the purpose of conducting any response activity related to the Site, including, but not limited to, the following activities:

    i.    Monitoring, investigation, removal, remedial or other activities at the Site;

    ii.    Verifying any data or information submitted to the United States;

    iii.    Conducting investigations relating to contamination at or near the Site;

    iv.    Obtaining samples;

    v.    Assessing the need for, planning, or implementing additional response actions at or near the Site;

    vi.    Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Settling Defendants or their agents, consistent with Section VII (Access to Information);

    vii.    Assessing Settling Defendants' compliance with this Consent Decree; and

    viii.    Determining whether the Site or other property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted, by or pursuant to this Consent Decree;

b. commencing on the date of lodging of this Consent Decree, refrain from using the Site, or such other property, in any manner that would interfere

-16-

1   with or adversely affect the implementation, integrity or protectiveness of the

2   remedial measures to be performed at the Site; and

3       c.    If the Department or EPA determines that institutional controls in

4   any form are required to implement response activities at the Site, ensure the

5   integrity and protectiveness thereof, or ensure non-interference therewith,

6   execute and record all such necessary legal instruments, and fully cooperate

7   with the Department and with EPA in their efforts to secure and enforce such

8   institutional controls. Institutional controls shall include deed restrictions, land

9   use covenants, environmental restrictions, as well as any layers of additional

10   protection in the form of state or local laws, regulations, ordinances or other

11   governmental instruments that serve the purpose of institutional controls set

12   forth above.

13       24.    Notwithstanding any provision of this Consent Decree, the United

14   States and the Department retain all of their access authorities and rights, as

15   well as all of their rights to require land/water use restrictions, including

16   enforcement authorities related thereto, under CERCLA, RCRA, and any other

17   applicable statute or regulations.

18   ## XII. ACCESS TO INFORMATION

19       25.    Settling Defendants shall provide to EPA and the Department,

20   upon request, copies of all records, reports, or information (hereinafter referred

21   to as "records") within their possession or control or that of their contractors or

22   agents relating to activities at the Site, including, but not limited to, sampling,

23   analysis, chain of custody records, manifests, trucking logs, receipts, reports,

24   sample traffic routing, correspondence, or other documents or information

25   related to the Site.

26       26.    Confidential Business Information and Privileged Documents.

27       a.    Settling Defendants may assert business confidentiality claims

28   covering part or all of the records submitted to EPA under this Consent Decree

1  to the extent permitted by and in accordance with Section 104(e)(7) of
2  CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Records
3  determined to be confidential by EPA will be accorded the protection specified
4  in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies
5  records when they are submitted to EPA, or if EPA has notified Settling
6  Defendants that the records are not confidential under the standards of Section
7  104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given
8  access to such records without further notice to Settling Defendants.

9      b.      Settling Defendants may assert that certain records are privileged
10  under the attorney-client privilege or any other privilege recognized by federal
11  law. If Settling Defendants assert such a privilege in lieu of providing records,
12  they shall provide Plaintiffs with the following: 1) the title of the record; 2) the
13  date of the record; 3) the name and title of the author of the record; 4) the name
14  and title of each addressee and recipient; 5) a description of the subject of the
15  record; and 6) the privilege asserted. However, no records created or generated
16  pursuant to the requirements of this or any other settlement with the United
17  States shall be withheld on the grounds that they are privileged.

18      27.    No claim of confidentiality shall be made with respect to any data,
19  including but not limited to, all sampling, analytical, monitoring, hydrogeologic,
20  scientific, chemical, or engineering data, or any other records evidencing
21  conditions at or around the Site.

22              **XIII. RETENTION OF RECORDS**

23      28.    Until 10 years after the entry of this Consent Decree, each Settling
24  Defendant shall preserve and retain all records now in its possession or control,
25  or which come into its possession or control, that relate in any manner to
26  response actions taken at the Site or the liability of any person under CERCLA
27  with respect to the Site, regardless of any corporate retention policy to the
28  contrary.

29.    After the conclusion of the document retention period in the preceding Paragraph, Settling Defendants shall notify Plaintiffs at least 90 days prior to the destruction of any such records, and, upon request by Plaintiffs, Settling Defendants shall deliver any such records to Plaintiffs.  Settling Defendants may assert that certain records are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Settling Defendants assert such a privilege, they shall provide Plaintiffs with the following:  1) the title of the record; 2) the date of the record; 3) the name and title of the author of the record; 4) the name and title of each addressee and recipient; 5) a description of the subject of the record; and 6) the privilege asserted.  However, no records created or generated pursuant to the requirements of this or any other settlement with the Plaintiffs shall be withheld on the grounds that they are privileged.

30.    Each Settling Defendant hereby certifies individually that, to the best of its knowledge and belief, after reasonable inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, reports, or information relating to its potential liability regarding the Site since notification of potential liability by the United States or the filing of suit against it regarding the Site and that it has fully complied with any and all EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XIV.  NOTICES AND SUBMISSIONS

31.    Whenever, under the terms of this Consent Decree, notice is required to be given or a document is required to be sent by one party to another, it shall be directed to the individuals listed below, unless those individuals or their successors give notice of a change to the other Parties in writing.  Written notice as specified herein shall constitute complete satisfaction of any written notice requirement of the Consent Decree with respect to the

1   United States, EPA, DOJ, the Department, and Settling Defendants,

2   respectively.

3   <u>For Notice to the United States</u>:

4           Chief, Environmental Enforcement Section
               Environment and Natural Resources Division

5           U.S. Department of Justice
               P.O. Box 7611

6           Washington, D.C. 20044-7611
               Re: DJ # 90-11-2-354/3

7

8           Roberto Rodriguez
               Remedial Project Manager

9           U.S. Environmental Protection Agency
               Region IX

10          75 Hawthorne Street,
               San Francisco, CA 94105

11           Keith Takata
               Director, Superfund Division

12           United States Environmental Protection Agency
               Region 9

13          75 Hawthorne Street,
               San Francisco, CA 94105

14   <u>For Notice to the Department, and California Attorney General</u>

15

16           Stewart Black
               Deputy Director for Brownfields and Environmental Restoration Program

17           Department of Toxic Substances Control
               P.O. Box 806

18           Sacramento, California 95812

19           Jackie Spiszman
               Department of Toxic Substances Control

20          5795 Corporate Avenue
               Cypress, California 90630

21           Ann Rushton
               Deputy Attorney General

22           California Department of Justice
               300 South Spring Street

23          Los Angeles, California 90013

24   <u>For Notice to the Settling Defendants</u>:

25           To the name and address indicated on the signature page.

26

27

28

## XV. RETENTION OF JURISDICTION

32.    This Court shall retain jurisdiction over this matter for the purpose of interpreting and enforcing the terms of this Consent Decree.

## XVI. INTEGRATION/APPENDICES

33.    This Consent Decree and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

34.    The following appendices are attached to and incorporated into this Consent Decree:

Appendix A is the IROD;

Appendix B is  the ESD;

Appendix C is the map of the Site; and

Appendix D is the List of Settling Defendants.

Appendix E is the Schedule of Settling Defendants' Payments

## XVII. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

35.    This Consent Decree shall be lodged with the Court for a period of not less than 30 days for public notice and comment.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations which indicate that this Consent Decree is inappropriate, improper, or inadequate.  Settling Defendants consent to the entry of this Consent Decree without further notice.

36.    If for any reason this Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the discretion of any party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

-21-

## XVIII. SIGNATORIES/SERVICE

37.     Each undersigned representative of a Settling Defendant to this Consent Decree, the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice, and the Deputy Director for Brownfields and Environmental Restoration Program of the California Department of Toxic Substances Control certify that he or she is authorized to enter into the terms and conditions of this Consent Decree and to execute and bind legally such Party to this document.

38.     Each Settling Defendant hereby agrees not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree, unless the United States or the Department has notified Settling Defendants in writing that it no longer supports entry of the Consent Decree.

39.     Each Settling Defendant shall identify, on the attached signature page, the name and address of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this Consent Decree, including for purposes of Notices under Paragraph 31. Settling Defendants hereby agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including but not limited to, service of a summons. The Parties agree that Settling Defendants need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XIX. EFFECTIVE DATE

40.     The Effective Date of this Consent Decree is the date of approval of this Consent Decree by a United States District Court, and (i) such approval of a Consent Decree has not been appealed or petitioned to the Ninth Circuit Court of Appeals, or (ii) in the event of any further appeal or challenge to the Consent Decree in any other forum or venue, the date of a final order from such

forum or venue either denying such appeal or challenge or upholding the Consent Decree.

## XXI. FINAL JUDGMENT

41.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute the final judgment between and among the Plaintiffs and the Settling Defendants.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED.

7/29/2011
DATE

_____
HONORABLE AUDREY B. COLLINS
UNITED STATES DISTRICT JUDGE

1  The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>
2  <u>Air Distribution Products, et al.</u>, (C.D. Cal).

3

4  FOR THE UNITED STATES OF AMERICA, DOJ:

5

6

7

8

9

10

11

12

13  Date: 9/18/10

IGNACIA S. MORENO
14  Assistant Attorney General
Environment and Natural Resources Division
15  U.S. Department of Justice
Washington, D.C. 20530

16  /s/ Steven O'Rourke
STEVEN O'ROURKE
17  Environmental Enforcement Section
Environment and Natural Resources Division
18  U.S. Department of Justice
P.O. Box 7611
19  Washington, D.C. 20044-7611

20

21

22

23

24

25

26

27

28

-24-

1   The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>

2   <u>Air Distribution Products, et al.</u>, (C.D. Cal).

3

4   FOR THE UNITED STATES OF AMERICA, EPA:

5

6   Date: 6/14/2010

                        JANE DIAMOND

7                     Director, Superfund Division

                        United States Environmental Protection Agency

8                     Region 9

                        75 Hawthorne Street

9                     San Francisco, CA 94105

10

11                  /s/ James Collins

                        JAMES COLLINS

12                   Assistant Regional Counsel

                        United States Environmental Protection Agency

13                   Region 9

                        75 Hawthorne Street

14                   San Francisco, CA 94105

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>
2  <u>Air Distribution Products, et al.</u>, (C.D. Cal).

3  FOR THE DEPARTMENT OF TOXIC SUBSTANCES CONTROL, and
4  CALIFORNIA ATTORNEY GENERAL

5

6  Date: 5/12/10                    *Stewart W. Black*
7                                   STEWART BLACK
                                     Deputy Director, Brownfields and
8                                        Environmental Restoration Program
                                     Department of Toxic Substances Control
9                                    P.O. Box 806
                                     Sacramento, California 95812

10                                   *Ann Rushton*
11        7 - 2 - 10                 /s/ Ann Rushton
                                     ANN RUSHTON
12                                   Deputy Attorney General
                                     California Department of Justice
13                                   300 South Spring Street
                                     Los Angeles, California 90013

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-26-

1   The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>

2   <u>Air Distribution Products, et al.</u>, (C.D. Cal).

3

4   FOR SETTLING DEFENDANT AIR DISTRIBUTION PRODUCTS:

5

6

7   Representative Authorized to Sign:

8

9

10   Date: 7-30-1  Signature: _____

11             Name: Ross C. McCollum

12             Title: President

13             Address: 79203 Eisenhower Ave

14                          Indio, Cal

15                          92201

16

17   Agent Authorized to Accept Service and Notice:

18

19             Name: _____

20             Title: _____

21             Address: _____

22                      _____

23

24

25

26

27

28

-27-

1    The undersigned party hereby enters into this Consent Decree in the matter of United States, et al. v.

2    Air Distribution Products, et al., (C.D. Cal):

3

4    FOR SETTLING DEFENDANT RUDOLPH B. BARBEE, INDIVIDUALLY
     AND AS TRUSTEE OF THE BARBEE FAMILY TRUST:

5

6    Representative Authorized to Sign:

7

8    Date:_____     Signature: _Rudolph Barbee_____

9                     Name: _Rudolph Barbee_____

                      Title: _Individually and as Trustee of the Barbee_____
10                                                    Family Trust

     Address: _____
11

12                    _____

13

14

15   Agent Authorized to Accept Service and Notice:

16

17                    Name: _____Jennifer Taggart_____

18                    Title: _____Attorney_____

19                    Address: _____Demetriou, Del Guercio_____

20                              _801 S. Grand Ave Suite 1000_

21                              _Los Angeles CA 90017_

22

23

24

25

26

27

28

1  The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>
2  <u>Air Distribution Products, et al.,</u> (C.D. Cal).

3
4  FOR SETTLING DEFENDANT CHEVRON U.S.A., INC.:

5  Representative Authorized to Sign:
6
7  Date: 22 April 2010    Signature: _____
8                          Name:      **Frank G. Soler**
9                          Title:     **Assistant Secretary**
10                         Address:   6001 Bollinger Canyon Rd
11                                    San Ramon, CA  94583
12
13
14 Agent Authorized to Accept Service and Notice:
15
16                         Name:      Corporation Service Company
17                         Title:
18                         Address:   2730 Gateway Oaks Drive, Suite 100
19                                    Sacramento, CA  95833
20
21
22
23
24
25
26
27
28

-29-

1  The undersigned party hereby enters into this Consent Decree in the matter of United States, et al. v.
2  Air Distribution Products, et al., (C.D. Cal).

3  FOR SETTLING DEFENDANT HARTWELL CORPORATION:

4
5  Representative Authorized to Sign:

6
7  Date: 5/10/10          Signature: _____

   Name:          Paul Tamborrino
8
   Title:         Special Assistant Environmental Affairs
9
   Address:       Hartwell Corporation
10                 900 Richfield Road
                   Placentia, CA 92870
11

12

13  Agent Authorized to Accept Service and Notice:

14

15                 Name:          Paul Tamborrino

16                 Title:         Special Assistant Environmental Affairs

17                 Address:       Hartwell Corporation
                                  900 Richfield Road
18                                Placentia, CA 92870

19

20  With a copy to:   Name:          John F. Cermak, Jr.
                                     Sonja A. Inglin
21                    Address:       Baker Hostetler LLP
                                     12100 Wilshire Boulevard, 15th Floor
22                                   Los Angeles, CA 90025

23

24

25

26

27

28

-30-

1  The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>

2  <u>Air Distribution Products, et al.</u>, (C.D. Cal).

3  FOR SETTLING DEFENDANTS MICHAEL KESSLER AND LISA D.
   KESSLER, AS TRUSTEES OF THE KESSLER LIVING TRUST; MARK
4  KESSLER, INDIVIDUALLY; MAUREEN KESSLER, INDIVIDUALLY;
   MARK KESSLER AND MAUREEN KESSLER AS TRUSTEES OF THE
5  KESSLER LIVING TRUST:

6

7  Representative Authorized to Sign:

8
   Date: 1/25/2010      Signature: _____
9
                        Name: _Michael Kessler_
10
                        Title: _____
11
                        Address: _____
12
                                 _____
13
                                 _____
14

15  Agent Authorized to Accept Service and Notice:

16

17                      Name: _____

18                      Title: _____

19                      Address: _____

20                               _____

21

22

23

24

25

26

27

28

                                    -31-A

1   The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>
2   <u>Air Distribution Products, et al.</u>, (C.D. Cal).

3   FOR SETTLING DEFENDANTS MICHAEL KESSLER AND LISA D.
    KESSLER, AS TRUSTEES OF THE KESSLER LIVING TRUST; MARK
4   KESSLER, INDIVIDUALLY; MAUREEN KESSLER, INDIVIDUALLY;
    MARK KESSLER AND MAUREEN KESSLER AS TRUSTEES OF THE
5   KESSLER LIVING TRUST:

6
7   Representative Authorized to Sign:

8
    Date: 1/25/2010          Signature: _____
9
                             Name: _____
10
                             Title: _____
11
                             Address: _____
12
13                                    _____

14

15  Agent Authorized to Accept Service and Notice:

16
17                           Name: _____
18                           Title: _____
19                           Address: _____
20                                    _____
21
22
23
24
25
26
27
28

                              -31-B

1   The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>
2   <u>Air Distribution Products, et al.</u>, (C.D. Cal).

3   FOR SETTLING DEFENDANTS MICHAEL KESSLER AND LISA D.
    KESSLER, AS TRUSTEES OF THE KESSLER LIVING TRUST; MARK
4   KESSLER, INDIVIDUALLY; MAUREEN KESSLER, INDIVIDUALLY;
    MARK KESSLER AND MAUREEN KESSLER AS TRUSTEES OF THE
5   KESSLER LIVING TRUST:

6
7   Representative Authorized to Sign:

8
9   Date: 1-26-10      Signature: _Mer Ye Mchll_
                       Name: MAureen Kossler   MArk Kessler
10                     Title: _____
11                     Address: _14 Calle La Reina_
12                              _Rancho Mirage, CA. 92270_
13

14

15  Agent Authorized to Accept Service and Notice:

16
17                     Name: _____
18                     Title: _____
19                     Address: _____
20                              _____
21
22
23
24
25
26
27
28

                              -31- C

1   The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>

2   <u>Air Distribution Products, et al.</u>, (C.D. Cal).

3   FOR SETTLING DEFENDANT LA VICTORIA FOODS, INC.:

4   Representative Authorized to Sign:

5

6   Date: 5/28/10    Signature: _Josef_

7                    Name: _Jose   David_

8                    Title: _VP Finance & Accounting_

9                    Address: _4340 Eucalyptus Av-_

10                   _Chino, CA 91710_

11

12

13  Agent Authorized to Accept Service and Notice:

14

15                   Name:    Steven R. Tekosky, Esq.

16                   Title:   Counsel

17                   Address: Tatro Tekosky Sadwick LLP

18                            333 S. Grand Avenue, Suite 4270

19                            Los Angeles, CA 90071

20

21

22

23

24

25

26

27

28

-32-

1    The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>
2    <u>Air Distribution Products, et al.,</u> (C.D. Cal).

3    FOR SETTLING DEFENDANT MANUFACTURER'S SERVICE, INC.:

4
5    Representative Authorized to Sign:

6
7    Date: 4/27/10      Signature:   _H W Allstun_____
8                       Name:        H.W. Allstun
9                       Title:       President
10                      Address:     9715 Klingerman Street
11                                   South El Monte, CA 91733

12
13   Agent Authorized to Accept Service and Notice:

14
15                      Name:        Todd O. Maiden, Esq.
16                      Title:       Reed Smith LLP
17                      Address:     101 Second Street, Suite 1800
18                                   San Francisco, CA 94105
19
20
21
22
23
24
25
26
27
28

-33-

1   The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al, v.</u>

2   <u>Air Distribution Products, et al.,</u> (C.D. Cal).

3   FOR SETTLING DEFENDANT NELSON TECHNICAL COATINGS, INC.:

4   Representative Authorized to Sign:

5

6   Date: 05/10/10    Signature: _____ Thor Nelson

7                     Name: _____ Thor Nelson

8                     Title: _____ President

9                     Address: _____ 17401  PALORA  ST

10                             _____ ENCINO  CA 91316

11

12

13  Agent Authorized to Accept Service and Notice:

14

15                  Name: _____ JAmes  Geocaris, Esq.

16                  Title: _____ Attorney

17                  Address: _____ 650 Town Center Dr, Ste 1400

18                          _____ Costa Mesa, CA 92626

19

20

21

22

23

24

25

26

27

28

-34-

The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>
<u>Air Distribution Products, et al.</u>, (C.D. Cal).

FOR SETTLING DEFENDANT PLASTIC DRESS-UP COMPANY:

Representative Authorized to Sign:

Date: 1/29/10   Signature: _____

Name: DENNIS M. FUNK

Title: CHIEF OPERATING OFFICER

Address: 11077 RUSH STREET

SOUTH EL MONTE, CA 91733

Agent Authorized to Accept Service and Notice:

Name: _____

Title: _____

Address: _____

          _____

1  The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>
2  <u>Air Distribution Products, et al.</u>, (C.D. Cal).

3  FOR SETTLING DEFENDANT WALLACE H. SIEGEL AND PHYLLIS F.
   SIEGEL, husband and wife, in their individual capacities; Wallace H. Siegel
4  and Phyllis F. Siegel, Trustees of all subtrusts under the Siegel Living Trust,
   dated February 14, 1976; Allen Siegel, an unmarried man, in his individual
5  capacity; Allen Siegel, trustee of all subtrusts under the Siegel Living Trust
   dated February 14, 1976; Allen Siegel, Executor of the Will of Dorothy Siegel,
6  deceased; Globe Drum Co., Inc., a dissolved California corporation:

7

8  Representative Authorized to Sign:

9
   Date: 06/16/2010      Signature:  _Wallace H Siegel_____
10                        Name:       Wallace H. Siegel_____
11                        Title:      Defendant_____
12                        Address:    3324 Rancho Rio Bonita Road____
13
                                      Covina, CA 91724_____
14

15

16  Agent Authorized to Accept Service and Notice:

17

18                        Name:       Robert Otis_____
19                        Title:      Attorney At Law_____
20                        Address:    308 North Monterey Street, Unit C__
21                                    Alhambra, CA 91801_____
22

23

24

25

26

27

28

1    The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>

2    <u>Air Distribution Products, et al.</u>, (C.D. Cal).

3    FOR SETTLING DEFENDANT TRI-FITTING MANUFACTURING
     COMPANY:

4

5    Representative Authorized to Sign:

6

7    Date: 2|9|10    Signature:    _Ralph Bernal_

8                    Name:         Ralph Bernal

9                    Title:        President of Tri-Fitting Manufacturing Co.

10                   Address:      10414 Rush Street

11                                 So El Monte, CA 91733

12

13   Agent Authorized to Accept Service and Notice:

14                   Signature:    _____

15                   Name:         Timothy D. McCollum

16                   Title:        Attorney

17                   Address:      5250 N. Palm Ave., Ste. 228

18                                 Fresno, California    93704

19

20

21

22

23

24

25

26

27

28

-37-

1    The undersigned party hereby enters into this Consent Decree in the matter of United States, et al. v.

2    Air Distribution Products, et al., (C.D. Cal).

3    FOR SETTLING DEFENDANT SARAH J. O'LEARY, AS THE TRUSTEE OF
     THE VANDERBOSCH 1984 FAMILY TRUST:
4

5    Representative Authorized to Sign:

6

7    Date: 07|12|2010     Signature:  _Sarah O'Leary, Trustee_

8                         Name:       _Sarah J. O'Leary_

9                         Title:      _Trustee_

10                        Address:    _c/o Clarkin, Sawyers & Phillips, P.C._

11                                    _20 William St. Suite G-75_

12                                    _Wellesley, MA  02481_

13

14   Agent Authorized to Accept Service and Notice:

15                        Name:       _Todd O. Maiden, Esg._

16                        Title:

17                        Address:    _Reed Smith LLP_

18                                    _101 Second Street Suite 1800_

19                                    _San Francisco, CA  94105_

20

21

22

23

24

25

26

27

28

                                         -38-

The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u> <u>Air Distribution Products, et al.</u>, (C.D. Cal).

FOR SETTLING DEFENDANTS THE ESTATE OF BENITO VELASQUEZ; BENITO VELASQUEZ, ADRIAN E. VELASQUEZ, ALBERT R. VELASQUEZ, MARY ANN STELL AND DORTHEA DEANE, AS CO-TRUSTEES OF THE VELASQUEZ TRUST, DATED 12/28/05, THE VELASQUEZ BY-PASS TRUST, DATED 11/08/06 AND THE MARITAL QTIP TRUST, DATED 11/15/06:

Representative Authorized to Sign:

Date: _1-18-2010_  Signature: _Adrian Edward Velasquez_

Name: _Adrien Edward Velasquez_

Title: _Trustee, Velasquez Family Trust, Velasquez By-Pass Trust Velasquez marital Trust QTIP_

Address: _419 Santa Cruz Rd_

_Arcadia CA 91007_

Agent Authorized to Accept Service and Notice:

Name: _CHARLES T. MATHEWS_

Title: _ATTORNEY, VELASQUEZ FAMILY TRUST_

Address: _2596 MISSION ST., SUITE 204_

_SAN MARINO CA 91108_

-39-

1    The undersigned party hereby enters into this Consent Decree in the matter of <u>United States, et al. v.</u>
2    <u>Air Distribution Products, et al.</u>, (C.D. Cal).

3    FOR SETTLING DEFENDANTS WESTERN MARKINGS, INC.; LINDA
     COLEMAN; MICHAEL MAURI, AS REPRESENTATIVE OF THE ESTATE
4    OF JULIE MAURI AND TRUSTEE OF THE MAURI FAMILY TRUST:

5
     Representative Authorized to Sign:
6

7
8    Date:_____       Signature: _Linda Coleman_

     Name:        Linda Coleman
9
     Title:       Secretary, Western Markings, Inc.
10
     Address:     16213 Glen Hope Drive
11
                  Valinda, CA  91744
12

13

14   Agent Authorized to Accept Service and Notice:

15

16                Name:     Todd O. Maiden, Esq.

17                Title:    Reed Smith LLP

18                Address:  101 Second Street, Suite 1800

19                          San Francisco, CA 94105

20

21

22

23

24

25

26

27

28

                              -40-

1  The undersigned party hereby enters into this Consent Decree in the matter of United States, et al. v.
2  Air Distribution Products, et al., (C.D. Cal.)

3

4  FOR JACK BARRY ZWAHLEN, AS AN INDIVIDUAL, AND AS TRUSTEE
5  OF JACK BARRY ZWAHLEN FAMILY TRUST

6  Representative Authorized to Sign:

7

8  Date: 5/31/10      Signature: _____

9                     Name:     Jack Barry Zwahlen

10                    Title:    Individual/Trustee

11                    Address:  13713 SE 37th Street

12                              Vancouver, WA 98683

13

14
   Agent Authorized to Accept Service and Notice:
15

16
                      Name:     Timothy D. McCollum
17
                      Title:    Attorney
18
                      Address:  5250 N. Palm Ave., Ste. 228
19
                                Fresno, CA 93704
20

21

22

23

24

25

26

27

28

-41-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Page intentionally left blank.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# APPENDIX A
## INTERIM RECORD OF DECISION

<u>Attachment 2 to Administrative Order 2003-17</u>

# INTERIM RECORD OF DECISION

## SAN GABRIEL VALLEY SUPERFUND SITE

## SOUTH EL MONTE OPERABLE UNIT

## LOS ANGELES COUNTY, CALIFORNIA

September 2000

United States Environmental Protection Agency

Region IX - San Francisco, California

44

# Contents

**Page**

**Part I - Declaration** ................................................................. **I-1**
   1.1   Site Name and Location ...................................................... I-1
   1.2   Statement of Basis and Purpose ............................................. I-1
   1.3   Assessment of the Site ...................................................... I-1
   1.4   Description of the Selected Remedy .......................................... I-2
   1.5   Statutory Determinations ..................................................... I-2
   1.6   ROD Data Certification Checklist

**Part II - Decision Summary** .......................................................... **II-1-1**

**1  Site Name, Location and Description** ............................................... **II-1-1**
   1.1   Site Description ............................................................ II-1-1

**2  Site History and Enforcement Activities** ........................................... **II-2-1**
   2.1   Site History ............................................................... II-2-1
   2.2   Remedial Investigation Activities ............................................. II-2-2
   2.3   Enforcement Activities ......................................................

**3  Community Participation** ........................................................ **II-3-1**

**4  Scope and Role of Operable Unit** ............................................... **II-4-1**

**5  Site Characteristics** .......................................................... **II-5-1**
   5.1   Location and Topography ..................................................... II-5-1
   5.2   Surface Water .............................................................. II-5-2
   5.3   Geology ................................................................... II-5-2
        5.3.1  San Gabriel Basin ..................................................... II-5-2
        5.3.2  South El Monte OU .................................................... II-5-3
   5.4   Hydrogeology .............................................................. II-5-3
        5.4.1  San Gabriel Basin ..................................................... II-5-3
        5.4.2  South El Monte OU .................................................... II-5-4
   5.5   Groundwater Management ...................................................
        5.5.1  San Gabriel Basin Judgment ............................................ II-5-5
        5.5.2  Long Beach Judgment ................................................. II-5-5
   5.6   Groundwater Contamination .................................................. II-5-5

**6  Current and Potential Future Site and Resource Uses** ................................ **II-6-1**
   6.1   Land Uses ................................................................ II-6-1
   6.2   Groundwater Uses ......................................................... II-6-1

**7  Summary of Site Risks** ......................................................... **II-7-1**
   7.1   Summary of Human Health Risk Assessment ..................................... II-7-1
        7.1.1  Identification of Chemicals of Concern .................................... II-7-2
        7.1.2  Exposure Assessment .................................................. II-7-2
        7.1.3  Toxicity Assessment ................................................... II-7-3
        7.1.4  Risk Characterization .................................................. II-7-4
   7.2   Summary of Ecological Risk Assessment

45

Page

7.2    Conclusion ........................................................ II-7-5

8.    Remediation Objectives ................................................ II-8-1

9.    Description of Alternatives ............................................. II-9-1
    9.1    Alternative 1  No Action ............................................ II-9-1
    9.2    Alternative 2  Groundwater Monitoring (No Active Response) .............. II-9-1
        9.2.1  Monitoring ................................................. II-9-2
    9.3    Alternative 3  Intermediate Zone Control in Western South El Monte OU ..... II-9-2
        9.3.1  Extraction ................................................. II-9-2
        9.3.2  Treatment ................................................. II-9-2
        9.3.3  Conveyance and Discharge ................................... II-9-2
        9.3.4  Monitoring ................................................. II-9-3
    9.4    Alternative 4  Intermediate Zone Control in Western South El Monte
            OU and Shallow Zone Source Control ............................. II-9-3
        9.4.1  Extraction ................................................. II-9-3
        9.4.2  Treatment ................................................. II-9-3
        9.4.3  Conveyance and Discharge ................................... II-9-3
        9.4.4  Monitoring ................................................. II-9-4

10.  Comparative Analysis of Alternatives ................................... II-10-1
        Threshold Criteria ................................................ II-10-1
        Primary Balancing Criteria ......................................... II-10-1
        Modifying Criteria ................................................ II-10-1
    10.1   Overall Protection of Human Health and the Environment ............... II-10-2
        10.1.1  Overall Protection of Human Health and the Environment:
                Evaluation of Alternatives ................................. II-10-2
    10.2   Compliance with ARARs ........................................... II-10-2
        10.2.1  Compliance with ARARs:  Evaluation of Alternatives ............ II-10-2
    10.3   Long-Term Effectiveness .......................................... II-10-3
        10.3.1  Long-Term Effectiveness and Permanence:
                Evaluation of Alternatives ................................. II-10-3
    10.4   Reduction of Toxicity, Mobility, and Volume Through Treatment ......... II-10-3
        10.4.1  Reduction of Toxicity, Mobility, or Volume Through Treatment:
                Evaluation of Alternatives ................................. II-10-4
    10.5   Short-Term Effectiveness .......................................... II-10-4
        10.5.1  Short-Term Effectiveness:  Evaluation of Alternatives ......... II-10-4
    10.6   Implementability ................................................. II-10-5
        10.6.1  Implementability:  Evaluation of Alternatives ................ II-10-5
    10.7   Cost ............................................................ II-10-6
        10.7.1  Cost:  Evaluation of Alternatives ........................... II-10-7
        10.7.2  Cost:  Comparison of Alternatives ........................... II-10-7
    10.8   State Acceptance ................................................. II-10-7
    10.9   Community Acceptance ............................................. II-10-7

Page

11 Selected Remedy ................................................................. II-11-1
   11.1 Description of the Selected Remedy .......................................... II-11-1
      11.1.1 Performance Criteria ................................................. II-11-2
      11.1.2 Compliance with Performance Criteria ................................ II-11-2
      11.1.3 Supplemental Explanation of Performance Criteria ..................... II-11-3
   11.2 Summary of Estimated Costs .............................................. II-1-5
   11.3 Expected Outcomes of the Selected Remedy ................................. II-11-6

12 Applicable or Relevant and Appropriate Requirements (ARARs) ................. II-12-1
   12.1 Chemical-specific ARARs ................................................ II-12-2
      12.1.1 Federal Drinking Water Standards ..................................... II-12-2
      12.1.2 California Drinking Water Standards ................................... II-12-3
   12.2 Location-specific ARARs ................................................. II-12-3
      12.2.1 Location Standards for TSD Facilities ................................. II-12-3
      12.2.2 Endangered Species Act ............................................. II-12-3
      12.2.3 California Fish and Game Code ........................................ II-12-3
      12.2.4 National Historic Preservation Act .................................... II-12-4
      12.2.5 Archaeological and Historic Preservation Act .......................... II-12-4
      12.2.6 Historic Sites, Buildings, and Antiquities Act ........................ II-12-4
   12.3 Action-specific ARARs .................................................. II-12-4
      12.3.1 Local Air Quality Management ........................................ II-12-4
      12.3.2 Federal Clean Water Act and California Porter-Cologne Water Quality Act .... II-12-5
      12.3.3 California Hazardous Waste Management Program ...................... II-12-6
   12.4 ARARs Waivers ......................................................... II-12-7

13 Statutory Determinations ..................................................... II-13-1
   13.1 Protection of Human Health and the Environment ........................... II-13-1
   13.2 Compliance with ARARs ................................................ II-13-1
   13.3 Cost-Effectiveness ...................................................... II-13-1
   13.4 Utilization of Permanent Solutions and Alternative Treatment
      Technologies to the Maximum Extent Practicable .......................... II-13-2
   13.5 Preference for Treatment as a Principal Element ........................... II-13-2
   13.6 Five-Year Reviews ...................................................... II-13-2

14 Documentation of Significant Changes ......................................... II-14-1

Part III – Responsiveness Summary ............................................... III-1-1

1 Responses to Written Comments ............................................... III-1-1
   1.1 Responses to Comments from the City of Monterey Park ...................... III-1-1
   1.2 Responses to Comments from the City of Pico Rivera ....................... III-1-2
   1.3 Responses to Comments from the City of South El Monte .................... III-1-3
   1.4 Responses to Comments from the Main San Gabriel Basin Watermaster ........ III-1-3
   1.5 Responses to Comments from the San Gabriel Basin Water Quality Authority ...... III-1-4
   1.6 Responses to Comments from the Upper San Gabriel Valley
      Municipal Water District (USGVMWD) .................................. III-1-5

Page

1.7   Responses to Comments from the Southeast Water Coalition (SEWC) .......... III-1-6
1.8   Responses to Comments from the Water Replenishment District
      of Southern California (WRD) ............................................ III-1-8
1.9   Responses to Comments from the San Gabriel Valley Water Company ........ III-1-9
1.10  Responses to Comments from the Southern California
      Water Company (SCWC) .................................................. III-1-11
1.11  Responses to Comments from South El Monte Businesses (Group A) .......... III-1-13
1.12  Responses to Comments from South El Monte Businesses (Group B) .......... III-1-18
1.13  Responses to Comments from South El Monte Businesses (Group C) .......... III-1-19
1.14  Responses to Comments from Art Weiss Industrial Properties ............... III-1-20
1.15  Responses to Comments from EEMUS Manufacturing Corp. ................... III-1-21
1.16  Responses to Comments from Aircraft Stamping Co., Inc. ................... III-1-22
1.17  Responses to Comments from Mr. Robert Vanderbosch ...................... III-1-23
1.18  Responses to Comments from Geosystem Consultants, Inc.
      (representing the South El Monte OU Participants) ....................... III-1-24
1.19  Responses to Comments from R Brown .................................... III-1-28
1.20  Responses to Comments from Mr. Allan Hill .............................. III-1-30
1.21  Responses to Comments from Congressman Matthew G. Martinez ............ III-1-30

2   Responses to Oral Comments ................................................ III-2-1
2.1   Responses to Comments from Mr. Royal Brown ............................. III-2-1
2.2   Responses to Comments from Mr. Philip Miller, Geosystem Consultants, Inc.
      (representing the South El Monte OU Participants) ....................... III-2-3
2.3   Responses to Comments from Mr. Bill Robinson, Upper San Gabriel
      Valley Municipal Water District (USGVMWD) .............................. III-2-5
2.4   Responses to Comments from Mr. Kirby Brill,
      San Gabriel Basin Water Quality Authority .............................. III-2-6
2.5   Responses to Comments from Mr. Larry Felix, South El Monte OU Participants ... III-2-7

References                                                                      R-1

Tables
1   Summary of Chemicals of Concern and Exposure Point Concentrations in Groundwater
2   Toxicity Values for Chemicals of Concern
3a  Estimated Total Excess Lifetime Cancer Risk from Potential Current Domestic Use of Groundwater
3b  Estimated Total Excess Lifetime Cancer Risk from Potential Future Domestic Use of Groundwater
4a  Estimated Total Noncancer Hazard Index from Potential Current Domestic Use of Groundwater
4b  Estimated Total Noncancer Hazard Index from Potential Future Domestic Use of Groundwater
5   Cost Comparison of Alternatives
6   Chemicals of Potential Concern
7   Detailed Cost Estimates for the Selected Remedy

Figures
1   Location Map of South El Monte Operable Unit
2   1998 Shallow VOC Contamination
3   1998 Deep VOC Contamination
4   Alternative Evaluation Matrix
5   Particle Tracking Results, Modified Alternative 3

**Part I
Declaration**

49

# Part I - Declaration

## 1.1   Site Name and Location

This Interim Record of Decision (ROD) addresses groundwater contamination at the South El Monte Operable Unit (South El Monte OU) located within the San Gabriel Valley Superfund Site Area 1 in Los Angeles County, California. The San Gabriel Valley Superfund Site Area 1 has a CERCLIS ID CAD980677355.

## 1.2   Statement of Basis and Purpose

This ROD presents the selected interim remedial action for the South El Monte OU of the San Gabriel Valley Superfund Site in accordance with the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et. seq., as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA) (collectively referred to herein as CERCLA) and to the extent practicable, the National Oil and Hazardous Substances Pollution Contingency Plan, 40 CFR Part 300 (NCP). This decision is based on the Administrative Record for this site.

The State of California, acting through the California Department of Toxic Substances Control (DTSC) and the Los Angeles Regional Water Quality Control Board (LARWQCB), concur with the selected remedy.

## 1.3   Assessment of the Site

The U.S. Environmental Protection Agency (EPA) has determined that volatile organic compounds (VOCs) have been released into groundwater within the South El Monte OU, and that a substantial threat of release to groundwater still exists. The response action selected in this ROD is necessary to protect the public health or welfare or the environment from actual or threatened releases of hazardous substances into the environment.

## 1.4   Description of the Selected Remedy

This interim action ROD addresses groundwater contaminated with VOCs. EPA's objective is to protect human health and the environment. The selected remedy is containment of groundwater contaminated with VOCs in the intermediate zone in the western portion of the South El Monte OU. This remedy includes performance criteria that will require extraction and treatment of contaminated groundwater at certain locations along the downgradient edge of the contamination, and other locations, as necessary, and will require continued monitoring and evaluation at other locations. The treated groundwater is expected to be delivered to local water purveyors, although other discharge options may be evaluated. In addition, this remedy includes monitoring in the shallow and intermediate groundwater zones in the South El Monte OU. Although it is not a component of the South El Monte OU interim remedy, EPA's planned remedy in the adjacent downgradient Whittier Narrows OU will play an important role in containing South El Monte OU contamination and meeting EPA's South El Monte OU remedial action objectives. The South El Monte OU interim remedy is the seventh interim remedial action that EPA selected to contain contaminated groundwater within the San Gabriel Valley Superfund Sites.

## 1.5   Statutory Determinations

The selected interim action remedy is protective of human health and the environment, complies with federal and state requirements that are applicable or relevant and appropriate to the interim remedial action, is cost effective, and utilizes permanent solutions to the maximum extent practicable. This remedy also satisfies the statutory preference for treatment as a principal element of the remedy (i.e., reduces the toxicity, mobility, or volume of materials through treatment).

Because this interim remedy will result in hazardous substances remaining onsite above levels that allow for unlimited use or unrestricted exposure, a statutory review will be conducted within five years after initiation of the interim remedial action to ensure that the remedy is, or will be protective of human health and the environment.

## 1.6   ROD Data Certification Checklist

The following information is presented in the Decision Summary section of this ROD. Additional information can be found in the Administrative Record file for this site.

- Chemicals of concern (COCs) and their respective concentrations

- Baseline risk represented by the COCs

- Current and future groundwater use assumptions used in the baseline risk assessment and ROD

- Groundwater use that will be available at the site as a result of the selected remedy

- Estimated capital, operation and maintenance (O&M), and total present worth costs; discount rate; and the number of years over which the remedy cost estimates are projected

- Decisive factors that led to selecting the remedy (i.e., how the selected remedy provides the best balance of tradeoffs with respect to the balancing and modifying criteria)

Cleanup levels in the aquifer are not included in this interim action ROD because this is an interim action remedy focused on groundwater containment.


Keith A. Takata                                    9-29-00
Keith A. Takata                                    Date
Director of Superfund Division
U.S. Environmental Protection Agency, Region IX

**Part II**
**Decision Summary**

*5.2*

# Part II - Decision Summary

This Decision Summary portion of the interim Record of Decision (ROD) summarizes the information and approaches that the U.S. Environmental Protection Agency (EPA) used to reach a decision on this remedy. It also establishes the remedy that EPA has selected.

# 1 Site Name, Location and Description

This ROD presents the selected remedial action to address groundwater contamination at the South El Monte Operable Unit (South El Monte OU) located within the San Gabriel Valley Superfund Site Area 1 in Los Angeles County, California.

## 1.1 Site Description

The South El Monte OU is part of the San Gabriel Valley Superfund Site Area 1 (CAD980677355), located in eastern Los Angeles County, California (Figure 1). The term "Operable Unit" (OU) is used to define a discrete action that is an incremental step toward a comprehensive site remedy. Operable units may address certain geographic areas, specific site problems, initial phases of a remedy; or a set of actions over time. In addition to the South El Monte OU, EPA has identified seven other OUs at the San Gabriel Valley Superfund Site. These are the Alhambra OU, Baldwin Park OU, El Monte OU, Puente Valley OU, Richwood OU, Suburban OU, and Whittier Narrows OU. EPA is the lead regulatory agency overseeing the cleanup at the San Gabriel Valley Superfund Site.

The San Gabriel Valley encompasses a basin that is approximately 170 square miles. Groundwater in the San Gabriel Basin is the primary drinking water source for more than one million people. Regional groundwater contamination by volatile organic compounds (VOCs) prompted EPA to place the San Gabriel Valley on the National Priorities List (NPL) in 1984. This list identifies the highest priority hazardous waste sites in the United States for investigation and cleanup.

The South El Monte OU covers approximately eight square miles in the south central portion of the San Gabriel Basin. The South El Monte OU is generally bounded by the San Bernardino Freeway (I-10) on the north, the Pomona Freeway (Highway 60) on the south, the San Gabriel River Freeway (I-605) on the east, and San Gabriel Boulevard on the west. The western boundary of the OU has moved from Walnut Grove Avenue, as described in the Feasibilty Study and Proposed Plan, to San Gabriel Boulevard because EPA was made aware that groundwater contamination had migrated further west in the vicinity of San Gabriel Boulevard. Most of the South El Monte OU has been developed, except the large area of land within the Whittier Narrows flood control basin. The South El Monte OU encompasses the entire city of South El Monte and parts of the cities of El Monte and Rosemead. Most of the OU area is zoned for residential use, particularly the eastern and western portions, and is likely to remain residential. Industrial activity, primarily small to medium-sized businesses, occurs across the central portion of the South El Monte OU.

An underground feature in the South El Monte OU called a groundwater flow divide controls the direction that groundwater and contaminants in groundwater can move and also affects the development and evaluation of cleanup alternatives for the OU. The flow divide generally occurs near Rush Street in the central portion of the OU (see Figures 2 and 3). Groundwater flow in the shallow zone (generally less than 100 feet below ground surface (bgs) is principally to the south and southwest towards Whittier

Narrows. Groundwater flow in the intermediate zone (generally between 100 and 400 feet bgs) in the vicinity north of Rush Street is towards the west. South of Rush Street intermediate zone flow is generally south/southwest towards Whittier Narrows.

VOCs are the primary organic contaminants found above state and federal drinking water standards (maximum contaminant levels or MCLs) in South El Monte OU groundwater. The VOCs tetrachloroethene (PCE) and trichloroethene (TCE) are the primary contaminants of concern (COCs). PCE and TCE are the VOCs that are detected most often and at the highest concentrations in groundwater, although other VOCs, including, 1,1-dichloroethane (1,1-DCA), cis-1,2-dichloroethene (cis-1,2-DCE), and 1,1-dichloroethene (1,1-DCE) have also been detected above drinking water standards in the South El Monte OU.

In general, VOC concentrations are highest in the shallow groundwater near industrial facility source areas where releases have occurred. EPA has not yet identified any specific "principal threat wastes," such as non-aqueous phase liquids (NAPLs) in the industrial source areas within the South El Monte OU. VOCs have also spread downward into the intermediate zone beneath the shallow zone, then migrated towards drinking water production wells located to the west and to the south in Whittier Narrows. Both of the impacted aquifer zones in the South El Monte OU (shallow and intermediate) are considered to be drinking water sources by the State of California and the intermediate zone is currently being used to supply drinking water. Several drinking water wells in the South El Monte OU have already been impacted by VOC contamination. These wells had to be shut down or equipped with wellhead treatment to reduce contaminant levels to drinking water standards.

In addition to the drinking water well impacts, contamination from the South El Monte OU has migrated to the south into the Whittier Narrows OU, threatening drinking water sources in the Central Basin south of the San Gabriel Basin. The downgradient groundwater impacts have resulted in EPA taking action to control contaminant migration in the Whittier Narrows OU. EPA's actions in Whittier Narrows will limit any further migration of contaminated groundwater into the Central Basin. Because EPA has already selected a remedial action for the downgradient Whittier Narrows OU, the selected interim remedial action for the South El Monte OU does not address the southerly migration of contamination in the shallow and intermediate zones. Figures 2 and 3 show VOC concentrations in shallow and intermediate groundwater zones as of 1999. The LARWQCB, working under a Cooperative Agreement with EPA, oversees site-specific investigations at individual industrial facilities where releases have occurred. The LARWQCB has directed individual facilities in the South El Monte OU to cleanup soil and shallow groundwater where elevated concentrations of contaminants were identified beneath the facility. These focused actions are intended to address the more highly-contaminated source areas, while EPA's actions address the widespread regional groundwater contamination.

# 2 Site History and Enforcement Activities

## 2.1   Site History

The San Gabriel Valley has been the subject of environmental investigation since 1979 when groundwater contaminated with VOCs was first identified. In May 1984, four broad areas of contamination within the basin were listed as San Gabriel Areas 1 through 4 on EPA's NPL. EPA subsequently divided the basin into eight operable units (OUs) to provide a means of describing hydrogeology and contaminant distribution, and planning remedial activities in the basin. The source of groundwater contamination in the basin is from industrial facilities.

In 1986, data were compiled and reviewed to develop a preliminary conceptual hydrogeologic model of the San Gabriel Valley, as described in the Supplemental Sampling Program (SSP) Report (EPA, 1986). The results of the SSP investigations provided much of the basis for planning the remedial investigations that have been performed in the San Gabriel Valley since 1986. The Interim San Gabriel Basin Remedial Investigation Report (EPA, 1992a) describes these investigations and incorporates their results into an integrated discussion of EPA's understanding of hydrogeologic conditions in the basin.

EPA issued a draft Statement of Work (SOW) for a remedial investigation and feasibility study (RI/FS) to address groundwater contamination in the South El Monte OU. On July 25, 1995, EPA entered into an Administrative Consent Order for the South El Monte OU RI/FS. The group of PRPs that implemented the South El Monte OU RI/FS was known as the South El Monte OU Participants.

Sources of VOC contamination in the South El Monte OU include industrial facilities engaged in the manufacture of aerospace precision machines, aircraft fittings, pharmaceutical products and injectable drugs, chemicals, furniture, salsa, paint, jewelry, machine parts, cosmetic and dental composites, bathroom hardware, aluminum containers, precision sheet metals, electrical connectors, hand tools, and compressors; hazardous waste liquid storage and handling; drum reconditioning and recycling; petroleum storage and distribution; plastic molding; and battery recycling.

## 2.2   Remedial Investigation Activities

EPA developed the RI/FS process for conducting environmental investigations under Superfund. The RI/FS approach is the methodology that the Superfund program has established for characterizing the nature and extent of risks posed by uncontrolled hazardous waste sites to evaluate potential remedial options. The RI serves as a mechanism to collect data for site characterization. The FS serves as the mechanism for development, screening, and evaluation of potential remedial alternatives. As stated in the Statement of Work, the RI/FS was designed to meet the following goals:

- Assess aquifer characteristics and characterize the vertical and lateral distribution of concentrations of VOCs in groundwater in the South El Monte OU area to support a focused FS and the selection of one or more interim actions for the South El Monte OU area.

- Develop and analyze alternatives for appropriate interim remedial actions to control the vertical and horizontal migration of groundwater with relatively higher concentrations of VOCs to areas in the South El Monte OU with relatively lower concentrations of VOCs.

An RI program was conducted for the South El Monte OU during 1996 and 1997. The RI field program consisted of evaluation of inactive production wells, installation of multi-port monitoring wells completed

in the shallow and intermediate zones, groundwater quality and level monitoring. The final RI Report was submitted to EPA in August 1998.

An FS was performed for the South El Monte OU in 1998 and 1999. The FS identified remedial action objectives, assembled remedial action alternatives, and provided an evaluation of the remedial action alternatives using the nine Superfund evaluation criteria established by EPA. The final FS Report was submitted to EPA in April 1999.

## 2.3 Enforcement Activities

EPA began its enforcement efforts in the South El Monte OU in 1985 by searching historical federal, state, and local records for evidence of chemical usage, handling, and disposal in the South El Monte OU area. At approximately the same time, the RWQCB initiated its Well Investigation Program (WIP) to identify sources of groundwater contamination. In 1989, EPA entered into a cooperative agreement with the RWQCB to expand the WIP program, to assist EPA in determining the nature and extent of the sources of groundwater contamination in the San Gabriel Valley, and to identify responsible parties. The RWQCB directly oversees facility-specific investigations in the South El Monte OU; EPA helps fund these activities and, when necessary, uses its enforcement authority to obtain information and ensure that facility investigations are promptly completed.

As of December 1999, the RWQCB has sent chemical use questionnaires to approximately 1,300 facilities in the South El Monte OU area; inspected approximately 1,000 of these facilities; and directed approximately 286 facilities to perform soil, soil gas, and/or groundwater investigations. EPA has concurrently used its authority under Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) to request information from more than 100 current and former owners and operators in the South El Monte OU. From these investigations, EPA has, to date, identified 43 facilities as sources of groundwater contamination in the South El Monte OU. EPA is continuing to gather data on facilities in the South El Monte OU and may identify additional facilities as sources of groundwater contamination after issuance of this ROD. The RWQCB has issued approximately 15 enforcement orders (Corrective Action Order [CAO], Administrative Civil Liability [ACL], etc.) to facilities that failed to timely comply with facility-specific investigation and/or cleanup activities required by the RWQCB.

In 1990 and 1991, EPA sent General Notice of Liability letters to representatives of 93 facilities in the South El Monte OU. In February 1994, EPA issued an Unilateral Administrative Order requiring one PRP to conduct a remedial investigation at its facility. On August 15, 1995, EPA sent Notification Letters to 49 potentially responsible parties (PRPs), representing 42 facilities, requesting that these parties participate in the South El Monte OU Interim RI/FS. Subsequently, EPA sent Notification Letters to two additional PRPs. Thirty of these notified PRPs, and three others that did not receive the notices, formed the South El Monte Participants that conducted the Interim RI/FS. The South El Monte OU Participants completed the RI/FS in April 1999.

Since 1995, EPA and the RWQCB have continued to investigate potential sources of contamination and expect to notify additional entities that they have been identified as PRPs. EPA is now in the process of identifying a final group of PRPs for the South El Monte OU. EPA anticipates issuing Special Notice letters to the South El Monte OU PRPs after the ROD is issued.

EPA and the RWQCB have undertaken enforcement activities elsewhere in the San Gabriel Valley, including facility investigations, issuance of CERCLA section 104(e) requests for information, issuance of General and Special Notice letters, and filing of cost recovery litigation. PRPs in the Puente Valley

and El Monte OUs previously entered into Administrative Consent Orders to perform the RI/FS activities for their respective OUs. EPA also issued a Unilateral Administrative Order to two parties in the Puente Valley OU and one party in the El Monte OU. In the Baldwin Park OU, EPA issued a ROD in March 1993, and in May 1997 sent Special Notice letters to 19 PRPs seeking performance of the remedial design and remedial action (RD/RA). Following the discovery of perchlorate contamination and lengthy negotiations, in July 2000, EPA issued Unilateral Administrative Orders to the 19 PRPs requiring implementation of the RD/RA.

# 3 Community Participation

The Proposed Plan for this remedy, in the form of a fact sheet, was distributed to the parties on EPA's mailing list for the South El Monte OU in September 1999. The Proposed Plan, together with the Final South El Monte OU RI (Geosystems Consultants, Inc., 1998) and FS (Geosystems Consultants, Inc., 1999) reports and other pertinent documents, were also included in the Administrative Record file available at EPA's Superfund Records Center at EPA's Regional Office in San Francisco, and locally at two information repositories: the West Covina Library and the Rosemead Library. The Administrative Record for the South El Monte OU was placed in CD-ROM format in each repository

In addition, EPA held a public meeting to present the Proposed Plan and EPA's preferred alternative on October 27, 1999, at the South El Monte High School in South El Monte, California. At this meeting, EPA answered questions and accepted oral comments pertaining to the South El Monte OU and the preferred alternative. A transcript of this meeting is available at the EPA's Superfund Records Center and at the two information repositories.

Notice of EPA's public meeting, availability of the Proposed Plan, and the announcement of a 60-day public comment period was published in the San Gabriel Valley Daily Tribune on September 30, 1999.

The public comment period ran from September 30 to November 29, 1999. EPA received numerous sets of written comments during the public comment period. These comments and the substantive oral comments are addressed in the Responsiveness Summary, included as Part III of this ROD.

II-3-1

# 4   Scope and Role of Operable Unit

There are four areas of groundwater contamination in the San Gabriel Basin aquifer listed on the NPL as San Gabriel Valley Areas 1 through 4.   Groundwater contamination in the San Gabriel Valley extends over very large areas (approximately 30 square miles).  In the valley, there are a number of different areas of contamination with distinct conditions and contaminant sources.  To facilitate implementation of remedial actions, EPA has divided the site into eight different OUs (Figure 1):

* Alhambra OU – RI/FS underway

* Baldwin Park OU – Interim ROD signed, EPA has ordered the PRPs to implement remedy

* El Monte OU – Interim ROD signed, EPA is negotiating with PRPs to implement remedy

* **South El Monte OU – Subject of this Interim ROD**

* Whittier Narrows OU – Interim ROD Amendment signed, EPA is currently conducting the Remedial Design

* Suburban OU – No action remedy selected in ROD.

* Richwood OU – The remedial action for this water supply remedy has been completed by the state.

* Puente Valley OU – Interim ROD signed, EPA is negotiating with PRPs to implement remedy

The South El Monte OU remedial action selected in this ROD is an interim action because it is limited to controlling the migration of contamination. Additional remediation may be needed to clean up VOC contamination remaining in the groundwater.  EPA will use information collected during operation of the selected remedy to help determine the need for additional actions and the nature of the final remedy.  Future remedial actions may include additional actions at or in the vicinity of industrial facilities identified as groundwater contamination sources in the South El Monte OU.  This interim action will neither be inconsistent with, nor preclude, implementation of a final remedy.  The OU-specific actions currently being undertaken in the San Gabriel Valley are primarily interim actions. It is anticipated that a final ROD will be issued for the entire San Gabriel Valley Superfund sites once interim remedial actions have been selected for the individual OUs.

# 5   Site Characteristics

## 5.1   Location and Topography

The South El Monte OU lies in the south-central portion of the San Gabriel Valley (Figure 1), approximately 25 miles from the Pacific Ocean, in eastern Los Angeles County. The San Gabriel Valley is a broad piedmont plain that slopes gradually to the southwest at a gradient of approximately 65 feet per mile (California Department of Water Resources [CDWR], 1966). The San Gabriel Valley contains the subsurface San Gabriel Basin. This structural basin is a natural groundwater reservoir that collects rainfall on the valley floor and run-off from the surrounding highlands, recharging the groundwater aquifer.

The San Gabriel Basin is bounded to the north by the San Gabriel Mountains and to the southwest, south, and southeast by a crescent-shaped system of low hills. The hills making up the system, from west to east, are the Repetto, Merced, Puente, and San Jose Hills. The only significant break along this boundary falls between the Merced and Puente Hills at Whittier Narrows. Whittier Narrows is the lowest point in the San Gabriel Valley and is the exit for the San Gabriel and Rio Hondo Rivers and their tributaries, which serve as the drainage system for the valley.

The South El Monte OU covers a surface area of approximately eight square miles. The OU is not defined by any significant physiographic features. The South El Monte OU varies from approximately 312 feet mean above sea level (MSL) in the northeast to 200 feet above MSL in the southwest.

San Gabriel Boulevard defines the western boundary of the South El Monte OU, as described in Section 1.1. The northern, eastern and southern boundaries coincide with the San Bernardino Freeway (I-10), the San Gabriel River Freeway (I-605) and the Pomona Freeway (Highway 60), respectively.

Most of the annual precipitation in the South El Monte OU occurs intermittently during the winter months of December through March. The long-term average precipitation for the San Gabriel Basin is about 18 inches per year. Temperatures are usually moderate; the average annual temperature in the San Gabriel Valley is about 62 degrees Fahrenheit (°F). January and July are the coldest and warmest months of the year, respectively.

## 5.2   Surface Water

Two major stream systems carry surface flow from the San Gabriel Valley: the San Gabriel River and the Rio Hondo and their tributaries. The headwaters for these two systems are in the San Gabriel Mountains. The systems transverse the San Gabriel Valley in a southwesterly direction and exit the valley at Whittier Narrows. Except in the case of significant storms, these channels do not carry much natural run-off. There is considerable non-natural flow from industrial and wastewater plant discharge and imported surface water intended for groundwater recharge.

Nearly all of the stream channels comprising the surface water drainage of the San Gabriel Valley have been modified and concrete-lined (including a portion of the Rio Hondo and its tributaries in the South El Monte OU vicinity). This lining minimizes recharge of the aquifer by surface water flow.

The San Gabriel River is located near and parallel to the eastern boundary of the South El Monte OU and is unlined. The Rio Hondo is concrete-lined in the northwestern portion of the South El Monte OU, but unlined in the southwestern portion. The Rio Hondo drains the northwest portion of the San Gabriel Valley. The Rio Hondo traverses the South El Monte OU from the northwest to the southwest and exits near the southwest corner of the OU. Most of the flow in the Rio Hondo is diverted into the Peck Road

Spreading Grounds north of the South El Monte OU, so significant flow in the Rio Hondo through the South El Monte OU is limited to substantial storm events.

Where the river channels are unlined, surface water recharges the underlying aquifers. Recharge from the San Gabriel River occurs year round because of the continuous flow created by discharges of treated waste water. Recharge form the Rio Hondo is seasonal but may be significant, particularly downstream of the South El Monte OU in Whittier Narrows.

## 5.3   Geology

### 5.3.1 San Gabriel Basin

The San Gabriel Basin is filled with alluvial deposits, primarily of Quaternary age, which overlie relatively impermeable rock. These deposits are 2,000 to 4,000 feet thick over the center of the basin and range between approximately 250 to 800 feet thick at the basin outlet in Whittier Narrows. The deepest portion of the San Gabriel Basin, reportedly in excess of 4,000 feet deep, is located in the northwest portion of the South El Monte OU.

There are two distinct sources of sediment in the basin: the coarse-grained crystalline rocks of the San Gabriel Mountains and the finer-grained sedimentary rocks of the hills to the southeast and southwest. Sediment derived from the San Gabriel Mountains to the north is generally coarser-grained than that from the hills to the south. Consequently, hydraulic conductivity of the alluvium generally increases with proximity to the San Gabriel Mountains. The distribution of the sediments deposited in the basin is also controlled by the position relative to river and tributary courses. In particular, coarse-grained sediments are prevalent in the San Gabriel River proximity. Most of the San Gabriel Basin is characterized by interfingering lenses of alluvial deposits (e.g., cobbles, gravel, silt, and clay) and the alluvial deposits show a high degree of variability in sediment type, both vertically and laterally.

Major structural features controlling regional ground-water flow in the San Gabriel Basin include the topographic highs (i.e., San Gabriel Mountains and southern hills) and topographic lows (i.e., Whittier Narrows). Four major faults in the San Gabriel Basin potentially impact ground-water flow: the Sierra Madre Fault System, the Raymond Fault, the Lone Hill-Way Hill Fault, and the Workman Hill Fault.

### 5.3.2 South El Monte OU

The sediments encountered during the South El Monte OU RI were unconsolidated alluvial deposits. Based on regional studies (CDWR, 1966), the surface sediments are primarily Recent alluvial deposits that are underlain by Pleistocene-age older alluvium. The Recent alluvial deposits are not readily discernible from the older alluvium. In general, the lithology in the eastern half of the South El Monte OU is coarser than the western half because of the influence of the San Gabriel River. In the western portion of the OU, particularly west of the Rio Hondo, the aquifer contains more extensive finer-grained deposits.

In significant portions of the South El Monte OU, there is a shallow water-bearing zone that is separated, to varying degrees, from a deeper intermediate water-bearing zone by a sequence of finer-grained, low permeability soils. The separation between the shallow and intermediate zones is corroborated by differences in water chemistry and groundwater levels.

In the western half of the South El Monte OU, the shallow zone extends from the water table to the top of the separating sequence, which was generally encountered between 60 and 130 feet bgs. The average

61

depth to the bottom of the shallow zone is approximately 100 feet bgs. The shallow zone consists of sand and gravel layers interbedded with finer-grained soils.

Throughout most of the western part of the South El Monte OU, the shallow and intermediate zones are separated by a sequence of finer-grained soils rather than a single, homogenous fine-grained stratum. The separating sequence of finer-grained soils varies in thickness from about 45 to 165 feet. The composition of the separating sequence is variable. In the far northwest portion of the OU, it is primarily silts and clays. Towards the southern edge of the South El Monte OU, the separating sequence is poorly defined or absent. percentages of sand and gravel and in some locations the separating sequence is poorly defined or absent.

The intermediate zone is the water-bearing zone present from the base of the separating sequence to a depth of approximately 400 feet bgs. The 400 foot depth was selected based on water quality data indicating that this is approximately the maximum depth of VOC exceedances of drinking water standards in the area. The intermediate zone consists of a series of coarse-grained sediments (sands and gravels) interspersed with periodic thin lenses of finer-grained strata.

## 5.4    Hydrogeology

### 5.4.1 San Gabriel Basin

The San Gabriel Groundwater Basin comprises approximately 167 square miles of water-bearing valley land (CDWR, 1966). The maximum depth of alluvial fill within the main basin is unknown, though CDWR (1966) shows an alluvial depth of more than 4,000 feet at a location in the northwest portion of the South El Monte OU (CDWR, 1966).

Natural features that control the regional pattern of groundwater movement in the San Gabriel Basin include topographic highs (San Gabriel Mountains and southern hills) and lows (the valley floor, especially Whittier Narrows), and to some extent faults. Generally, groundwater in the basin flows from topographically high to low areas in the absence of groundwater pumping. In addition, groundwater flow is also controlled by the locations of significant recharge, such as undeveloped alluvial fans, riverbeds and spreading basins. Recharged groundwater moves away from these areas, generally towards topographically lower areas. Under natural groundwater flow conditions, such as those encountered in the first half of this century, groundwater generally flowed away from the margins of the basin towards the center of the alluvial valley, and then towards Whittier Narrows (EPA, 1992a).

In parts of the basin, including the western portion of the South El Monte OU, concentrated groundwater withdrawal by pumping significantly affects the direction and rate of groundwater flow. With the increased use of wells to extract groundwater from the basin, the pattern of groundwater flow in the basin has changed over time (EPA, 1992a). About 80 percent of the groundwater discharge from the San Gabriel Basin is now to production wells (EPA, 1992a). The remaining groundwater discharge consists of subsurface outflow through Whittier Narrows and minimal discharge to surface water in Whittier Narrows and Puente Valley.

### 5.4.2 South El Monte OU

As described above, based on the lithologic, water-level, and contamination data generated during the RI, the aquifer in much of the South El Monte OU has been divided into: a shallow zone (representing approximately the upper 50 to 100 feet of the aquifer); a finer-grained separating sequence of varying thickness present beneath the shallow zone; and an intermediate zone that is found beneath the separating sequence and extends to a depth of approximately 400 feet. The aquifer in the South El Monte OU extends much deeper than 400 feet (perhaps to as deep as 4,000 feet), however significant contamination

is not expected at depths of greater than 400 feet. The unconsolidated deposits in the South El Monte OU are of fluvial origin and consist of interbedded sediments comprised of gravel, sand, silt, and clay and mixtures of these materials.

Depth-to-water in the western half of the South El Monte OU (where the RI activities were focused) ranges from approximately 40 feet bgs in the northern portion of the OU to less than 25 feet bgs along the southern boundary of the OU.

Hydraulic conductivity is a measure of how easily fluids can flow through porous media. The geologic materials in the South El Monte OU vary from clay to gravel over short distances, thus estimates of hydraulic conductivity in the area can vary considerably. On average, the hydraulic conductivity of the shallow zone is expected to be in the 200 to 300 feet/day range and the intermediate zone in the 50 to 100 feet/day range. Specific testing of two shallow extraction wells installed in the south-central portion of the OU during the RI/FS yielded hydraulic conductivity estimates in the 150 to 400 feet/day range.

### Groundwater Flow

Groundwater flow is described below in terms of flow direction and gradient, both in the horizontal and vertical dimensions. Horizontal flow is discussed for the shallow zone, where higher levels of VOC contamination occur, and the intermediate zone where lower levels of VOC contamination occur.

Shallow groundwater contours prepared during the RI/FS indicate relatively uniform flow to the southwest throughout most of the South El Monte OU at hydraulic gradients averaging about 0.002 (Geosystems Consultants, Inc., 1998). The shallow zone flow direction is less clear in the northwest corner of the OU. There is the potential that active production wells located to the west are impacting shallow zone water levels and flow direction in the northwest corner of the OU.

Intermediate zone piezometric surface contours prepared during the RI/FS indicate relatively uniform flow to the southwest, into Whittier Narrows, with a hydraulic gradient of about 0.002 (Geosystems, Consultants, Inc., 1998). In the northwest corner of the OU, however, flow is towards the west and northwest with a gradient of about 0.003. Flow to the northwest in this area is consistent with extraction from production wells to the west and northwest. The location of the groundwater flow divide that separates flow towards the south from flow towards the west likely varies seasonally and with changes in the western pumping.

The shallow and intermediate zone groundwater elevation data recorded during the RI/FS were used to estimate vertical hydraulic gradients between adjacent screen intervals in the multi-port monitoring wells. In nearly all cases, vertical gradients are downward, ranging in magnitude from 0.001 to as much as 0.238 between the shallow and intermediate zones in the well located in the northwest corner of the OU (Geosystems Consultants, Inc., 1998) The large vertical gradients in the northwest corner of the OU indicate the high degree of separation between the shallow and intermediate zones in this area.

The downward vertical gradients are the result of pumping in the intermediate aquifer and resistance to vertical flow caused by the finer-grained separating sequence.

## 5.5 Groundwater Management

The South El Monte OU is located in the Main San Gabriel Basin. The rights to pump groundwater from the San Gabriel Basin are adjudicated (i.e., assigned to specified users in accordance with a court judgment). There are two judgments that govern groundwater management in the South El Monte OU vicinity.

## 5.5.1 San Gabriel Basin Judgment

Water rights in the Main San Gabriel Basin were adjudicated in a stipulated judgment by the Superior Court of Los Angeles County in 1973. This adjudication resulted in assigning water rights to approximately 50 parties that each hold rights to greater than one percent of the natural safe yield of the basin (152,700 acre-feet per year, established in the judgment), and approximately 100 parties that each hold rights to less than 1 percent of the natural safe yield. Also, according to the judgment, only selected parties have the right to export groundwater out of the Main San Gabriel Basin.

As amended in 1992, the judgment also establishes the duties of a Watermaster, which include annually determining an operating safe yield for the basin, monitoring pumpers' compliance with the judgment, issuing permits for all new and increased pumping in the basin, and preparing an annual report that includes details of pumping activities in the basin. The amount of groundwater that each water rights holder can pump in any year is adjusted by prorating the pumper's prescriptive rights (percentage of natural safe yield) by the operating safe yield, as established by the Watermaster.

The majority of the groundwater pumped from the Main San Gabriel Basin is used for drinking water, supplied to the public by purveyors that are regulated as public water supply systems. Annually, pumping typically equals or exceeds the operating safe yield of the basin. When excess extraction occurs, the judgment has established provisions for assessing pumpers the cost of importing replacement water to replenish the excess amount extracted. Replacement water is imported water purchased by the Upper San Gabriel Valley Municipal Water District and artificially recharged within the basin. The 1997-98 replacement water assessment was $246.65 per acre-foot.

### 5.5.2 Long Beach Judgment

The Long Beach Judgment is the 1964 settlement of a lawsuit between parties in the Central and San Gabriel Basins. This judgment mandates that an average of 98,415 acre-feet of useable water will be delivered to the Central Basin each year. This water consists of: (1) surface flow that passes through Whittier Narrows, (2) subsurface (groundwater) flow through Whittier Narrows, and (3) a portion of the water exported (piped) from the San Gabriel Basin to the Central Basin.

Although the Long Beach Judgment specifies an average entitlement of 98,415 acre-feet per year, the actual entitlement is calculated yearly by the court-appointed San Gabriel River Watermaster. The San Gabriel River Watermaster tabulates the water discharge through Whittier Narrows. If more than 98,415 acre-feet are delivered to the Central Basin from the San Gabriel Basin in a year, then the San Gabriel Basin is credited with the excess. Conversely, if less is delivered, the San Gabriel Basin is required to make up the difference either from past credits or, if that is not sufficient, through delivery of imported surface water as makeup water to the Central Basin.

# 5.6   Groundwater Contamination

VOCs are the primary organic contaminants found in groundwater above state and federal drinking water standards in the South El Monte OU. PCE and TCE are the VOCs that are detected most often in groundwater, although other VOCs, including 1,1-DCA, cis-1,2-DCE, and 1,1-DCB were detected at high concentrations in selected portions of the shallow zone during the South El Monte OU RI. One other VOC, 1,4-dioxane, has also been detected at several locations in the South El Monte OU, but at relatively low concentrations. 1,4-Dioxane is important because it requires different treatment technologies than most of the other VOCs and is more expensive to remove from the water. A limited number of additional contaminants were detected during the RI, but at lower concentrations and at fewer locations.

64

In general, VOC concentrations are highest in the shallow groundwater in the vicinity of industrial facility source areas where releases have occurred. Figure 2 shows the extent of VOC contamination in the South El Monte OU in the shallow zone. As shown in this figure, there are fairly large areas where VOC concentrations exceed 10 times the drinking water standards (or 50 micrograms per liter, $\mu g/L$) and several isolated smaller areas where concentrations exceed 100 times drinking water standards (or 500 $\mu g/L$). In these areas, concentrations of PCE and TCE detected during the last round of sampling for the South El Monte OU RI/FS range from about 40 to 730 $\mu g/L$ and non-detect to 730 $\mu g/L$, respectively. Figure 2 clearly illustrates the large area of shallow contamination that has migrated out of the South El Monte OU and into the downgradient Whittier Narrows OU.

TCE and PCE concentrations in the intermediate zone in the South El Monte OU are much lower, generally less than 50 $\mu g/L$. However, there are a couple of areas in the intermediate zone with elevated VOC concentrations, including one area where PCE concentrations exceed 100 times the drinking water standards (or 500 $\mu g/L$). The highest VOC concentrations detected in the intermediate zone in the South El Monte OU during the RI/FS was 200 $\mu g/L$ at a multi-port monitoring well zone screened from 209 to 218 feet bgs. Subsequent sampling of this well showed concentrations of 500 $\mu g/L$. As is the case in most of the shallow zone, PCE is detected at higher concentrations than TCE in the intermediate zone. The extent of intermediate zone contamination is shown in Figure 3. Multi-port monitoring well data indicate that exceedances of drinking water standards extend down at least as deep as 400 feet bgs. Only limited data are available from depths deeper than 400 feet bgs. As is the case in shallow zone, intermediate zone exceedances of drinking water standards extend out of the South El Monte OU and into the downgradient Whittier Narrows OU.

As described above, EPA has identified numerous industrial facilities in the South El Monte OU as contaminant sources where releases have impacted groundwater quality. To address the industrial areas that contain these sources, the RWQCB, with funding from EPA, oversees site-specific investigations and cleanups.

Within the South El Monte OU, EPA's RI efforts focused on regional groundwater contamination and EPA has not yet identified any specific areas of principal threat wastes. At some of the individual industrial facilities, where elevated concentrations of contaminants have been identified in the vadose zone and shallow groundwater, the RWQCB is overseeing facility-specific remedial actions. These focused actions should address the more highly-contaminated source areas.

65

# 6 Current and Potential Future Site and Resource Uses

## 6.1 Land Uses

The South El Monte OU consists of densely populated residential communities, mixed with light and heavy industrial areas, and commercial land use. Outside of the portion of the Whittier Narrows Recreation Area that extends into the southwest corner of the South El Monte OU, the area is essentially fully developed with very limited undeveloped or open areas. Within the OU, there are a number of relatively large industrial/commercial developments. Much of South El Monte, however, features numerous small industrial operations. In the portions of the South El Monte OU where the shallow groundwater contamination addressed in this ROD is found, land use is primarily light and heavy industrial. Residential areas are found adjacent to these industrial areas.

The South El Monte OU includes the entire City of South El Monte and parts of the cities of El Monte and Rosemead. Nearly all of the South El Monte OU area is fully developed, except the large block of land in the southern portion of the OU that is part of the Whittier Narrows flood control basin. Most of the land in the OU is zoned for residential use, particularly in the far eastern and western portions of the OU. These areas are likely to remain residential. Industrial activity, primarily small to medium-sized businesses, occurs across a significant area in the central portion of the South El Monte OU. There is also a relatively large industrial area along the northern boundary of the OU. Land use in the South El Monte OU area is not expected to change significantly over time.

## 6.2 Groundwater Uses

The State of California has designated all portions of the San Gabriel Basin aquifer as either a current or potential source of drinking water. Currently, groundwater extracted within the South El Monte OU is used as municipal water supply for residential, commercial and industrial purposes. As discussed previously, water rights in the Main San Gabriel Basin are fully adjudicated. Thus, the Main San Gabriel Basin Watermaster monitors all extraction. The producers that extract groundwater from within the South El Monte OU are: Amarillo Mutual Water Company, California American Water Company, California Domestic Water Company, Del Rio Mutual Water Company, City of El Monte, Los Angeles County, City of Monterey Park, San Gabriel Valley Water Company, and Woodland Farms (agricultural user). VOCs are detected in nearly all production wells in the South El Monte OU area. The City of El Monte, Los Angeles County, the City of Monterey Park, and San Gabriel Valley Water Company have had to shut down wells because of contamination and both the City of Monterey Park and San Gabriel Valley Water Company have installed wellhead treatment systems to address VOC contamination in production wells.

Production from the shallow zone is limited as most of the production wells are perforated in the deeper zone. There are currently no drinking water supply wells that draw water from the shallow, highly contaminated zones in the vicinity of industrial facilities. Future groundwater use in the OU vicinity is expected to be similar to current use, with active extraction occurring in many portions of the OU. Future extraction will likely be primarily from the intermediate zone and deeper.

66

# 7 Summary of Site Risks

EPA completed a Preliminary Baseline Risk Assessment (RA) for the South El Monte OU in 1997 (EPA, 1997a). The baseline risk assessment estimates the human health and environmental risks that the site could pose if no action were taken. It is one of the factors that EPA considers in deciding whether to take action at a site. In the South El Monte OU, EPA's decision to take action is based principally on the presence of contamination in groundwater at levels that exceed drinking water standards, evidence that contamination will continue to migrate into groundwater areas that are presently clean or less contaminated, and the current and potential use of groundwater in and around the South El Monte OU as a source of drinking water. The risk assessment is also used to identify the contaminants and exposure pathways that need to be addressed by the remedial action. This section of the ROD summarizes the results of the Preliminary Baseline RA for the South El Monte OU.

## 7.1   Summary of Human Health Risk Assessment

This summary of human health risk includes sections on the identification of chemicals of concern (COCs), exposure assessment, toxicity assessment, and risk characterization.

### 7.1.1 Identification of Chemicals of Concern

The Preliminary Baseline RA is based on data collected from production and monitoring wells between July 1993 and July 1995, except for 15 monitoring wells where data collected between February 1990 and April 1993 is used. The older data was used for the 15 wells because more recent sampling results were not available. Sampling data were available from 25 production wells, one EPA monitoring well, and 131 site assessment monitoring wells during this period. A total of 43 VOCs were detected in South El Monte OU groundwater and all of the VOCs detected were considered chemicals of potential concern (COPCs) for evaluation in the Preliminary Baseline RA. Of these 43 COPCs, only eight contributed significantly to the estimated risks and are discussed as chemicals of concern (COCs) in this RA summary. Table 1 provides information on these COCs in each of the seventeen well groupings and thirteen individual production wells considered in the RA.

As shown in Table 1, the eight COCs found in South El Monte OU groundwater that contribute significantly to the risk estimates were benzene, 1,2-dichloroethane (1,2-DCA), 1,2-dichloroethene (1,2-DCE), cis-1,2-dichlorothene (cis-1,2-DCE), 1,2-dichloropropane (1,2-DCP), trichloroethene (TCE), tetrachloroethene (PCE), and vinyl chloride. All of the COCs are VOCs and all are present in the most contaminated portion of the shallow zone. Only two of the COCs, PCE and TCE, were also found in the deeper production wells. The table also shows the frequency of detection (i.e., the number of times the chemical was detected in the samples collected from each well grouping or production well), generally using data from 1993 through 1995. The table indicates that PCE and TCE are the most frequently detected COCs in the South El Monte OU and represent the extent of contamination in groundwater at the site shown in Figures 2 and 3.

Table 1 presents the exposure point concentration for each of the COCs detected in each of the well groupings and production wells evaluated. In all cases, the highest exposure point concentrations were from either TCE or PCE. The arithmetic mean concentration shown in Table 1 was used for the calculations of "average" potential risk and either the maximum detected concentration or the 95th percentile (95%) upper confidence limit (UCL) on the arithmetic mean concentration (whichever was lower) was used as the exposure point concentration for calculating the maximum potential risk for each COC in each well group and production well.

## 7.1.2 Exposure Assessment

Exposure refers to the potential contact on an individual (or receptor) with a chemical. Exposure assessment is the determination or estimation of the magnitude, frequency, duration, and route of potential exposure. This section briefly summarizes the potentially exposed populations, the exposure pathways evaluated, and the exposure quantification from the Preliminary Baseline RA performed for the South El Monte OU.

Land use in the South El Monte OU is primarily residential, commercial and industrial. At the time of the Preliminary Baseline RA, there were twenty-three active or standby production wells in the South El Monte OU. Of these, all but one provide drinking water for domestic use. Exposure to contaminants in groundwater could occur through the use of groundwater for domestic purposes, such as ingestion of tap water, inhalation of contaminants from water used for bathing, cooking and laundering, and dermal contact with the water. The State of California has designated all portions of the San Gabriel Basin aquifer as either a current or potential source of drinking water. In the baseline RA, EPA evaluated two scenarios under which individuals might be exposed to contaminated groundwater:

1. Potential for a current resident to be exposed to contamination in groundwater through domestic use

2. Potential for a future resident to be exposed to contamination in groundwater through domestic use

Based on potential for exposure frequency, duration, and estimated intake, residents exposed to contaminated groundwater used for domestic purposes are expected to be the maximally exposed population.

It should be noted that the assumption that residents could be exposed to untreated groundwater from the well groupings or production wells evaluated is conservative. There are not currently any wells producing water for public drinking water supply from the highly contaminated shallow groundwater areas in the western or eastern portions of the South El Monte OU. Further, regulations, such as the Safe Drinking Water Act, currently prohibit water purveyors from serving water contaminated in excess of drinking water standards to consumers.

## 7.1.3 Toxicity Assessment

Table 1 shows the eight COCs that are the major risk contributors for the South El Monte OU. Based on data from various animal studies and other activities, two of the compounds (benzene and vinyl chloride) are classified as human carcinogens, four of the compounds (1,2-DCA, 1,2-DCP, PCE and TCE) are classified as probable human carcinogens (EPA weight of evidence class B2). The carcinogenic oral slope factors (toxicity values) for these six compounds are shown in Table 2.

All six of the above compounds are also considered carcinogenic through the inhalation route. The inhalation slope factors, based on data from various animal studies, for these six compounds are presented in Table 2.

The dermal route of exposure was incorporated into the preliminary baseline RA using an equation that incorporates the exposure point concentration and a dermal permeability constant (in centimeters/hour [cm/hr]). The dermal exposure risks are presented in Tables 3 and 4. The dermal permeability constants for the eight COCs are:

- Benzene- 0.021 cm/hr
- 1,2-DCA- 0.0053 cm/hr
- 1,2-DCE- 0.01 cm/hr

68

- 1,2-DCP - 0.01 cm/hr
- Cis-1,2-DCE - 0.01 cm/hr
- PCE - 0.048 cm/hr
- TCE - 0.016 cm/hr
- Vinyl Chloride - 0.0073 cm/hr

In addition to their classification as probable human carcinogens, six of the seven COCs (all except vinyl chloride) have toxicity data indicating their potential for adverse noncarcinogenic health effects in humans. The chronic toxicity data available for these compounds have been used to develop oral and inhalation reference doses (RfDs). The RfD represents a level that an individual may be exposed to that is not expected to cause any deleterious effect. The oral and inhalation RfDs are presented in Table 2.

## 7.1.4 Risk Characterization

This section presents the results of the evaluation of the potential risks to human health associated with exposure to contaminated groundwater in the South El Monte OU. Exposure scenarios are evaluated by estimating the noncarcinogenic and carcinogenic risks associated with them.

For carcinogens, risks are generally expressed as the incremental probability of an individual developing cancer over a lifetime as a result of exposure to the carcinogen. These risks are probabilities that usually are expressed in scientific notation (e.g., $1 \times 10^{-6}$). An excess lifetime cancer risk of $1 \times 10^{-6}$ indicates that an individual has a 1 in 1,000,000 chance of developing cancer as a result of site-related exposure. This is referred to as an "excess lifetime cancer risk" because it would be in addition to the risks of cancer individuals face from other causes such as smoking or exposure to too much sun. The chance of an individual developing cancer from all other causes has been estimated to be as high as one in three. EPA's generally acceptable risk range for site-related exposures is $10^{-4}$ to $10^{-6}$. An excess lifetime cancer risk of greater than one in ten thousand ($1 \times 10^{-4}$) is the point at which action is generally required at a site (EPA, 1991a).

The potential for noncarcinogenic effects is evaluated by comparing an exposure level over a specified time period (e.g., a life-time) with a reference dose (RfD) derived for a similar exposure period. The ratio of exposure to toxicity is called a hazard quotient (HQ). An HQ less than one indicates that a receptor's dose of a single contaminant is less than the RfD and that toxic noncarcinogenic effects from exposure to that chemical are unlikely. HQs for all COCs that affect the same target organ (e.g., liver) are added together to generate the Hazard Index (HI). An HI less than one indicates that noncarcinogenic effects from all the contaminants are unlikely. Conversely, an HI greater than one indicates that site-related exposures may present a risk to human health.

## Conclusions

Tables 3a, 3b, 4a and 4b present the risk characterization summaries for carcinogenic (Tables 3a and 3b) and noncarcinogenic effects (Tables 4a and 4b). The risk estimates presented in these tables are based on average and reasonable maximum exposure (RME) and were developed by taking into account various conservative assumptions about the frequency and duration of exposure to groundwater, as wells as the toxicity of the primary COCs.

To assess potential current residential exposure to groundwater through domestic use, data from all active drinking water wells sampled from July 1993 through July 1995 that had positive detections of VOCs were used (a total of thirteen production wells). The cumulative estimated hazard index was less than one for the average exposure and RME scenarios (Table 4a). The estimated excess lifetime cancer risk ranged from $5 \times 10^{-8}$ to $5 \times 10^{-7}$ for the average exposure scenario and $5 \times 10^{-7}$ to $3 \times 10^{-6}$ for the RME scenario (Table 3a). The estimated excess lifetime cancer risks based on exposure to groundwater from the

production wells that are currently active are either less than or towards the lower end of the $10^{-4}$ to $10^{-6}$ acceptable risk range used by EPA to manage risks at Superfund sites. In addition, the estimated risks for these production wells are conservative because they do not take into account treatment of groundwater or the blending of groundwater from these wells with other production wells. The water purveyors are prohibited from serving water that exceeds MCLs to any of their customers.

To assess potential future residential exposure to contamination in groundwater through domestic use, the preliminary RA focused on seventeen individual areas within the OU that had groundwater concentrations exceeding 10 times the primary drinking water standards (MCLs). These seventeen areas are represented by Well Groups 1 through 17 on Tables 3b and 4b. The well groups consist primarily of shallow monitoring wells at or near industrial facilities and include those wells with the highest VOC concentrations in the OU area. The shallow intervals monitored by these wells are not currently used for drinking water supply. Use of these well groups to evaluate potential future risk is a conservative approach. The estimated hazard index ranged from 0.07 to 4 for the average residential exposure scenario and 0.1 to 20 for the RME residential scenario (Table 4b). Major chemical contributors to the estimated hazard indices include benzene, cis-1,2-DCE, 1,2-DCB, PCE, and TCE. The estimated excess lifetime cancer risk ranged from $2\times10^{-6}$ to $8\times10^{-4}$ for the average exposure scenario and $2\times10^{-5}$ to $9\times10^{-3}$ for the RME (Table 3b). Major chemical contributors to the estimated excess lifetime cancer risk include benzene, 1,2-DCA, 1,2-DCP, PCE, TCE, and vinyl chloride. The estimated hazard indexes and excess lifetime cancer risks based on potential future exposure to groundwater from many of the Well Groups exceed the acceptable risk range ($1\times10^{-4}$ - $1\times10^{-6}$) used by the EPA to manage risks at Superfund sites. Based on these estimated risks, the areas around these well groups should be considered for remediation.

A screening level evaluation of volatile emissions to indoor air provides a conservative estimate of potential residential exposure to COCs in groundwater via this pathway. Potential current and future exposures were evaluated for the average and RME scenarios. The estimated hazard quotients for all of the production wells (used for potential current exposure) and well groups (used for potential future exposure) were all below 1. The estimated current excess lifetime cancer risks for indoor air using production wells were below $10^{-6}$ for both average and RME scenarios. The estimated excess lifetime cancer risks for potential future exposures to volatile emissions from groundwater using data from the 17 well groups ranges from $1\times10^{-6}$ to $9\times10^{-5}$.

Based on this risk characterization summary, actual or threatened releases of hazardous substances at this site, if not addressed by implementing the response action selected in this ROD, present a potential threat to public health, welfare, or the environment. As described in the preceding paragraphs, the groundwater contamination does not currently threaten public health or welfare.

## 7.2   Summary of Ecological Risk Assessment

An evaluation was conducted as part of this preliminary groundwater risk assessment to determine whether there are any potential ecological exposure pathways in the South El Monte OU. The potential for exposure to ecological receptors is related to the extent that groundwater contaminants migrate to or are discharged to surface water habitat. The environmental evaluation indicated that there are two plausible means for ecological receptors to be exposed to groundwater contaminants in the South El Monte OU:

- Extraction and discharge of contaminated groundwater into surface water bodies containing ecological receptors.

- Natural discharge of contaminated groundwater into surface water bodies that contain ecological receptors.

70

Outside of periodic, short-duration discharge associated with aquifer testing activities, there is no known surface-water discharge of extracted groundwater in the South El Monte OU. Based on the very limited frequency and duration of this RI-related type of discharge, no additional evaluation is warranted for this potential pathway.

The depth-to-groundwater in the South El Monte OU is generally between 15 and 50 feet bgs. Given these conditions, it is very unlikely that groundwater could discharge to surface water and potential exposures to aquatic and terrestrial organisms are unlikely as well. As indicated in EPA's Interim San Gabriel Basin RI Report (EPA, 1992a), natural discharge of groundwater to surface water (caused by shallow groundwater levels intersecting stream channel bottoms) is not expected in either the Rio Hondo or San Gabriel Rivers north of the Pomona Freeway (i.e., in the South El Monte OU area).

Based on this screening-level environmental evaluation, there are no complete ecological exposure pathways in the South El Monte OU.

## 7.3   Conclusion

In addition to the risk assessment, EPA has considered the state and federal drinking water standards (MCLs and MCLGs) that have been established for contaminants found in the South El Monte OU. MCLs and MCLGs are set at levels, including an adequate margin of safety, where no known or anticipated adverse health effects are expected to occur. Even if the cumulative carcinogenic site risk to an individual based on reasonable maximum exposure is less than $10^{-4}$ and the non-carcinogenic hazard quotient is less than 1, remedial action will generally be warranted if MCLs or non-zero MCLGs are exceeded ("Role of the Baseline Risk Assessment in Superfund Remedy Selection Decisions," OSWER Directive 9355.0-30, April 22, 1991).

Contaminant concentrations exceed MCLs throughout a significant portion of the South El Monte OU, including groundwater regions that are currently used as sources of drinking water. In some areas, contamination levels exceed 100 times MCLs. Based on the risk characterization, the presence of widespread contamination in excess of MCLs, the use of groundwater in the South El Monte OU as a source of drinking water, and evidence that the contamination is migrating, EPA has determined that actual or threatened releases of hazardous substances at this site, if not addressed by implementing the response action selected in this ROD, may present an imminent and substantial endangerment to public health, welfare, or the environment.

# 8 Remediation Objectives

EPA's Remedial Action Objectives (RAOs) for the South El Monte OU are to:

- Prevent exposure of the public to contaminated groundwater;

- Contain further migration of contaminated groundwater from more highly contaminated portions of the aquifer to less contaminated areas or depths;

- Reduce the impact of continued contaminant migration on downgradient water supply wells, and;

- Protect future uses of less contaminated and uncontaminated groundwater.

These objectives reflect EPA's regulatory goal of restoring usable groundwater to its beneficial uses wherever practicable, within a time frame that is reasonable, or, if restoration is deemed impracticable, to prevent further migration of the plume, prevent exposure to the contaminated groundwater, and evaluate further risk reduction (40 C.F.R. Section 300.430 (a) (1) (iii) (F)). The RAOs address the risks associated with exposure to contaminated groundwater in the South El Monte OU (described above in Section 7) by significantly limiting the potential for future exposure.

To meet the RAOs, migration control will be required in the South El Monte OU as long as VOC concentrations in migrating groundwater exceed state or federal drinking water standards. The RAOs for the South El Monte OU do not include numeric, chemical-specific objectives in the aquifer or a time frame for restoration because this is an interim action to contain contamination. Although this interim remedial action is not focused on mass removal, the proposed remedy will remove significant contaminant mass from the aquifer, in effect beginning the restoration process.

II-8-1

# 9 Description of Alternatives

EPA evaluated the four alternatives for the South El Monte OU:

- Alternative 1 – No Action,

- Alternative 2 – Groundwater Monitoring (No Active Response)

- Alternative 3 – Intermediate Zone Control in Western South El Monte OU, modified from that described in the FS (see Section 14)

- Alternative 4 – Intermediate Zone Control in Western South El Monte OU and Shallow Zone Source Control.

A brief description of the four remedial alternatives is presented below.

## 9.1   Alternative 1 – No Action

The NCP requires EPA to consider a no action alternative and to evaluate the risk to the public if no action were taken. The No-Action Alternative provides a baseline for comparison with other remedial alternatives under consideration. In this alternative, no remedial actions are taken to control contaminant migration from or within the South El Monte OU. This alternative does not include any groundwater monitoring, extraction, or treatment, so there is no cost associated with this alternative

The No-Action Alternative allows continued, uncontrolled migration of contamination. This alternative does not meet EPA's RAOs and does not comply with state and federal requirements.

## 9.2   Alternative 2 – Groundwater Monitoring (No Active Response)

The only remedial action specifically incorporated into Alternative 2 is groundwater monitoring to monitor VOC plume migration in the shallow and intermediate zones in the South El Monte OU. Alternative 2 does not have any extraction, treatment, conveyance, or discharge components. This alternative would rely solely on passive mechanisms such as dilution or dispersion to address contaminant migration. This alternative also assumes that the groundwater management activities described in Section 5.5 continue to limit human exposure to groundwater contamination. This alternative includes implementing a monitoring program using new and existing wells to monitor contaminant migration and compliance with the South El Monte OU remedial action objectives in the shallow and intermediate zones.

### 9.2.1 Monitoring

In order to estimate costs and evaluate effectiveness, this alternative assumes installation of three new multi-port monitoring wells monitoring the shallow and intermediate zones to supplement the existing monitoring well network. The monitoring program is assumed to include semi-annual monitoring of seven existing multi-port wells and three new multi-port wells.

## 9.3    Alternative 3   Intermediate Zone Control in Western South El Monte OU

Alternative 3 includes extraction, treatment, and monitoring of intermediate zone contaminated groundwater in the north-western half of the South El Monte OU. The system would be designed to contain groundwater with VOC concentrations exceeding primary drinking water standards (i.e., MCLs) that is moving in the intermediate zone from the source areas in the central portion of the OU towards groundwater pumping centers to the west. Drinking water wells completed in the intermediate zone in the western areas have already been impacted by VOC contamination above drinking water standards. Alternative 3 does not include any specific measures to address shallow and intermediate zone contamination migrating to the south towards Whittier Narrows. This alternative assumes that EPA's remedy in the Whittier Narrows OU will provide containment of this contamination. The key components of Alternative 3 are described below.

### 9.3.1 Extraction

For the intermediate zone contamination migrating towards the west, Alternative 3 provides the option of either installing new extraction wells, using existing San Gabriel Valley Water Company's (SGVWC) Plant 8 wells, City of Monterey Park's well MP 5, well MP 12 and proposed well MP 15P, and Southern California Water Company's (SCWC's) San Gabriel 1 and 2 wells (shown in Figure 5), or using a combination of new and existing wells. The intermediate zone extraction would control western migration of groundwater that exceeds drinking water standards.

The existing production wells that could potentially be incorporated into the extraction component of Alternative 3 are screened in the depth interval from approximately 200 feet bgs to 770 feet bgs. If new wells are used, they would likely be screened in the depth interval from approximately 250 to 450 feet bgs. The total extraction rate assumed for cost estimation purposes is 10,020 gallons per minute (gpm). This extraction rate is higher than that assumed in the FS. The higher extraction rate is needed to address the recently discovered contamination found further to the west than previously depicted (see Section 14 for additional details). The actual extraction well locations and rates would be determined during remedial design based on additional evaluation of the extent of contamination and further discussions with local water purveyors. Two cost estimates are presented in Table 5 to account for the use of either new extraction wells or existing water purveyor wells.

### 9.3.2 Treatment

Extracted groundwater containing VOCs that exceed drinking water standards would be treated by either air stripping with off-gas treatment or liquid-phase carbon adsorption. For cost estimation purposes, this alternative assumes a treatment system consisting of air stripping with carbon adsorption of VOCs in the off-gas. Other treatment processes could be evaluated during remedial design.

### 9.3.3 Conveyance and Discharge

If the necessary agreements can be reached, the treated water would be delivered to three of the local water purveyors with impacted wells and existing facilities in the western portion of the South El Monte OU: SGVWC, the City of Monterey Park, and SCWC. The assumed treatment plant locations are located at or adjacent to the facilities of these three water purveyors, so conveyance of treated water would be minimal. If necessary, other discharge options, such as aquifer recharge or surface water discharge, would be evaluated during remedial design.

### 9.3.4 Monitoring

Alternative 3 includes implementation of a monitoring program to monitor remedy performance and ensure compliance with the RAOs in the South El Monte OU. Both groundwater levels and groundwater quality would be measured as part of the evaluation of remedy performance. In order to estimate costs and evaluate effectiveness, this alternative assumes installation of two new multi-port monitoring wells and semi-annual sampling of the two new and seven existing multi-port wells.

## 9.4 Alternative 4 – Intermediate Zone Control In Western South El Monte OU and Shallow Zone Source Control

Alternative 4 includes all of the components described above for Alternative 3, plus a groundwater extraction and treatment system in the shallow zone source area in the South El Monte OU. The additional extraction is intended to inhibit migration of high-level shallow zone contamination from the South El Monte OU into shallow and intermediate zones in the downgradient Whittier Narrows OU that are currently less contaminated. The key components of the alternative are described below.

### 9.4.1 Extraction

The additional groundwater extraction in Alternative 4 would occur at two existing shallow extraction wells northeast of the Rosemead Boulevard/Highway 60 (Pomona Freeway) interchange (Figure 2). The shallow containment would focus on the largest area of high level contamination in the southern portion of the South El Monte OU (Figure 2), where contamination migrates to the south towards Whittier Narrows. Although the intent of the extraction would be containment, the existing wells are located in area where they would also remove significant amounts of contamination from the shallow aquifer. The additional extraction rate assumed for cost estimation purposes is 900 gpm. This would bring the total extraction rate to 10,920 gpm. The actual extraction rates for the shallow wells would be determined during remedial design.

### 9.4.2 Treatment

The treatment assumed for Alternative 4 is the same as that described above for Alternative 3 for the intermediate groundwater. The shallow groundwater would be treated for VOC removal by either air stripping with off-gas treatment or liquid-phase carbon adsorption. For cost estimation purposes, this alternative assumes a treatment system consisting of liquid-phase carbon adsorption. Other treatment processes could be evaluated during remedial design.

### 9.4.3 Conveyance and Discharge

Assumptions for the intermediate zone groundwater are the same as described above for Alternative 3. The discharge assumption for the treated shallow groundwater is groundwater recharge through infiltration galleries. If necessary, other discharge options, such as surface water discharge, would be evaluated during remedial design.

75

## 9.4.4 Monitoring

The groundwater monitoring program for Alternative 4 would combine the monitoring program described above for Alternative 3 with a program to evaluate the performance of the shallow zone extraction system. To monitor performance of the shallow component of the remedy, installation of four shallow piezometers and two shallow monitoring wells was assumed downgradient of the extraction wells.

# 10 Comparative Analysis of Alternatives

The four remedial alternatives described in Section 9 are evaluated using the nine Superfund evaluation criteria listed in 40 C.F.R. Section 300.430. The comparative analysis provides the basis for determining which alternative presents the best balance of the criteria. The first two evaluation criteria are considered threshold criteria that the selected remedial action must meet. The five primary balancing criteria are balanced to achieve the best overall solution. The two modifying criteria, state and community acceptance, are also considered in remedy selection.

## Threshold Criteria

- **Overall Protection of Human Health and the Environment** addresses whether each alternative provides adequate protection of human health and the environment, and describes how risks posed through each exposure pathway are eliminated, reduced, or controlled through treatment, engineering controls, and/or institutional controls.

- **Compliance with ARARs** addresses the requirement of Section 121(d) of CERCLA that remedial actions at least attain legally applicable or relevant and appropriate federal and state requirements, standards, criteria, and limitations, which are collectively referred to as "ARARs," unless such ARARs are waived under CERCLA Section 121(d)(4).

## Primary Balancing Criteria

- **Long-term Effectiveness and Permanence** refers to the ability of a remedy to maintain reliable protection of human health and the environment over time.

- **Reduction of Toxicity, Mobility, or Volume Through Treatment** refers to the anticipated performance of the treatment technologies that may be included as part of a remedy.

- **Short-term Effectiveness** addresses the period of time needed to implement the remedy and any adverse impacts that may be posed to workers and the community during construction and operation of the remedy until cleanup goals are achieved.

- **Implementability** addresses the technical and administrative feasibility of a remedy from design through construction and operation. Factors such as availability of services and materials, administrative feasibility, and coordination with other governmental entities are also considered.

- **Cost** evaluates the estimated capital, operation and maintenance (O&M), and indirect costs of each alternative in comparison to other equally protective alternatives.

## Modifying Criteria

- **State Acceptance** indicates whether the state agrees with, opposes, or has concerns about the preferred alternative.

- **Community Acceptance** includes determining which components of the alternatives interested persons in the community support, have reservations about, or oppose.

This section describes each threshold and primary balancing criterion, evaluates each alternative in relation to each criterion, and identifies advantages and disadvantages among the alternatives in relation to each criterion. Figure 4 presents a comparative matrix in which the four alternatives are ranked for each of the evaluation criterion. The details of how the rankings have been assigned for each criterion are provided below.

77

II-10-1

## 10.1 Overall Protection of Human Health and the Environment

The NCP requires that all alternatives be assessed to determine whether they can adequately protect human health and the environment from unacceptable risks from site contamination. These risks can be mitigated by eliminating, reducing, or controlling exposure to hazardous substances, pollutants, or contaminants.

### 10.1.1 Overall Protection of Human Health and the Environment: Evaluation of Alternatives

Alternatives 1 and 2 provide the least overall protection of human health and the environment. Neither alternative has an active remedy component that provides migration control or containment of the contaminated groundwater. Only the existing groundwater management activities discussed in Section 5.5 would be available to control public exposure to the contaminated groundwater but would not contain the contaminated groundwater. Limitations of Alternative 1 include increased long-term potential for human exposure; leaving the burden of constructing treatment facilities to water purveyors; and increased cost, difficulty, and time required for containment. As long as existing government controls remain in effect, there should be no increase in long-term potential for human exposure with Alternative 2. The burden and cost of constructing required treatment facilities would be borne by the water purveyors. Alternative 2 includes groundwater monitoring that would provide early warning of increases in contaminant concentrations at downgradient drinking water sources. An advantage of Alternatives 1 and 2 is that there are no risks associated with treatment residuals because none are created.

Considered in conjunction with EPA's interim remedy for the Whittier Narrows OU, Alternatives 3 and 4 both satisfy EPA's remedial action objectives and reduce long-term risks to human health and the environment by containing contaminated groundwater and preventing migration from more highly contaminated areas to less contaminated areas. Alternatives 3 and 4 both address western intermediate zone contamination in the South El Monte OU. The intermediate zone contamination in the western portion of the South El Monte OU has impacted several production wells and EPA believes that controlling further contaminant migration in the intermediate zone is critical. The treatment technologies employed by these alternatives are effective at meeting federal and state MCLs. Alternative 4 is ranked higher than Alternative 3 because it includes discrete containment in a portion of the highly-contaminated shallow zone in the South El Monte OU. Alternative 4 extraction also provides additional mass removal in the shallow zone in the OU.

## 10.2 Compliance with ARARs

This evaluation criterion is also a threshold requirement and is used to determine if each alternative would attain federal and state ARARs, or whether there is adequate justification for invoking waivers for specific ARARs.

### 10.2.1 Compliance with ARARs: Evaluation of Alternatives

Alternatives 1 and 2 do not meet ARARs. Both alternatives allow for continued migration of contaminants above MCLs into less contaminated and uncontaminated portions of the groundwater.

Alternatives 3 and 4 were designed, in conjunction with EPA's interim remedy for the Whittier Narrows OU, to meet the ARARs described in Section 12 of this ROD. These alternatives provide containment of

contaminated groundwater as well as protection of existing production wells and significant portions of the aquifer that are currently less contaminated or uncontaminated.

## 10.3  Long-Term Effectiveness

This evaluation criterion assesses the extent to which each remedial alternative reduces risk after the remedial action objectives are met. Residual risk can result from exposure to untreated waste or treatment residuals. The magnitude of the risk depends on the magnitude of the wastes and the adequacy and reliability of controls, if any, that are used to manage untreated waste and treatment residuals. For this interim action, untreated waste refers to any contaminated groundwater not removed from the aquifer.

The performance of the alternatives in relation to this criterion is evaluated primarily by estimating the extent to which each alternative prevents the migration of contamination into less contaminated and uncontaminated areas. Preventing or reducing contaminant migration reduces contaminant concentrations in downgradient areas, reducing risk by reducing the likelihood of exposure. Because this is an interim remedy to contain contaminant migration, untreated wastes will remain in the groundwater.

### 10.3.1  Long-Term Effectiveness and Permanence:  Evaluation of Alternatives

Alternatives 1 and 2 are ranked low for this criterion because neither alternative has an active remedy component that provides migration control or containment of the contaminated groundwater. Contaminated groundwater would continue to migrate downgradient. Although natural attenuation processes (adsorption, dilution, dispersion) would likely decrease the concentration of contaminants in the plumes, downgradient water supply wells would be vulnerable to VOC contamination. Alternatives 1 and 2 would not generate any treatment residuals.

In conjunction with EPA's interim remedy for the Whittier Narrows OU, Alternatives 3 and 4 provide containment of contaminated groundwater as indicated by groundwater modeling. Alternatives 4 is assigned a slightly higher ranking than Alternative 3 because Alternative 4 provides supplemental shallow zone source control within the South El Monte OU. Because the Whittier Narrows OU remedy is providing containment at the downgradient boundary of contamination, the benefits of additional shallow zone control in Alternative 4 are more for contaminant removal than migration control. Less contaminated groundwater not contained by the remedial actions in Alternatives 3 and 4 would be subject to natural attenuation processes as it migrates downgradient. The effectiveness of natural attenuation processes would be verified by groundwater sampling.

In Alternatives 3 and 4 the residual generated from treatment of contaminated groundwater would be spent granular activated carbon. This spent granular activated carbon would be reactivated offsite. The transportation and reactivation of this residual would be conducted in accordance with applicable regulations and would present minimal long-term risks because contaminants adsorbed to the granular activated carbon would be destroyed during the reactivation process.

## 10.4  Reduction of Toxicity, Mobility, and Volume Through Treatment

This criterion addresses the preference, as stated in the NCP, for selecting remedial actions employing treatment technologies that permanently and significantly reduce toxicity, mobility, or volume of the hazardous substances as a principal element of the action. This preference is satisfied when treatment is

used to reduce the principal threats at a site through destruction of toxic contaminants, reduction of total mass of toxic contaminants, irreversible reduction in contaminant mobility, or reduction of total volume of contaminated media.

This evaluation focuses on the following factors for each remedial alternative:

- Whether the alternative satisfies the statutory preference for treatment as a principal element

- The treatment process employed, including the amount of hazardous materials that will be destroyed or treated and the degree of expected reduction in toxicity, mobility, or volume

- The degree to which treatment is irreversible

- The type and quantity of treatment residuals that will remain following treatment

## 10.4.1   Reduction of Toxicity, Mobility, or Volume Through Treatment: Evaluation of Alternatives

Alternatives 1 and 2 do not provide any reduction in toxicity, mobility, or volume over existing conditions and do not satisfy the statutory preference for treatment. Alternatives 3 and 4 satisfy the statutory preference for treatment. These alternatives would significantly reduce the volume and mobility of contamination by inhibiting further contaminant migration. The treatment technologies considered for Alternatives 3 and 4, air stripping with off-gas controls and liquid-phase carbon adsorption, would irreversibly reduce the toxicity and volume of contaminants in the extracted groundwater and result in an effluent stream that meets drinking water standards for VOCs. Alternative 4 would provide greater reduction in the volume of contaminants present in the aquifer, although this increased contaminant removal increases costs substantially. Both treatment technologies would result in the destruction of VOCs when the granular activated carbon is regenerated

## 10.5   Short-Term Effectiveness

This criterion evaluates the effects of each remedial alternative on human health and the environment during the construction and implementation phase until remedial action objectives are met. The following factors are addressed for each alternative:

- **Protection of workers and the community during construction and implementation phases.** This factor qualitatively examines risk that results from implementation of the proposed remedial action and the effectiveness and reliability of protective measures.

- **Environmental impacts.** This factor addresses the potential adverse environmental impacts that may result from the construction and implementation of an alternative. This factor also evaluates the reliability of the available mitigation measures to prevent or reduce potential impacts.

- **Time until RAOs are achieved.** This factor considers the amount of time required to construct remediation facilities and meet the remedial action objectives.

## 10.5.1   Short-Term Effectiveness:  Evaluation of Alternatives

Alternative 1 is not evaluated for this criterion because there is no construction or implementation phase and RAOs would not be met. None of the other three alternatives pose unmitigable risks to the community during construction and implementation. Nor do any of the alternatives pose unmitigable risks to workers beyond general construction hazards associated with large construction projects. No

unmitigable negative environmental impacts are anticipated in the areas in which facilities would be constructed.

For Alternative 2, the RAOs would not be met as long as contaminant migration continues, which would likely be a considerable length of time. For Alternatives 3 and 4, in conjunction with operation of the Whittier Narrows OU remedy, the RAOs are met as soon as the groundwater extraction and treatment components begin operation and establish hydraulic control.

## 10.6  Implementability

This criterion addresses the technical and administrative feasibility of implementing an alternative and the availability of various services and materials required during its implementation. The following factors are considered:

### Technical Feasibility

- Ability to construct and operate: addresses any technical difficulties and unknowns associated with construction or operation of the technology

- Reliability of technology: focuses on the likelihood that technical problems associated with implementation will lead to schedule delays

- Ease of undertaking additional remedial action: includes a discussion of what, if any, future remedial actions may need to be undertaken and how the remedial action would interfere with, or facilitate, the implementation of future actions

### Administrative Feasibility

- Coordination with other agencies, including the need for agreements with parties other than EPA required for construction and operation of the remedy.

- Availability of necessary equipment, specialists, and provisions to assure any necessary resources

- Availability of services and materials, plus the potential for obtaining competitive bids

## 10.6.1  Implementability:  Evaluation of Alternatives

Alternative 1 is not evaluated for this criterion because no action is implemented. As described above, the implementability evaluation incorporates several factors. Each of these is discussed separately in the following text.

**Technical Feasibility:  Ability to Construct and Operate.** The extraction, treatment, and conveyance technologies included in Alternatives 3 and 4 and the monitoring technologies included in Alternatives 2 through 4 are widely used. No significant difficulties are expected in construction and operation of these technologies.

**Technical Feasibility:  Reliability of Technology.** The extraction, treatment, conveyance, and monitoring technologies included in Alternatives 3 and 4 and the monitoring technologies included in Alternative 2 are generally proven and known to be reliable.

**Technical Feasibility:  Ease of Undertaking Additional Remedial Actions.** The alternatives would not interfere with the implementation of future response actions to further contain contamination or restore groundwater in the South El Monte OU area.

81

**Administrative Feasibility.** There are not likely to be any significant administrative feasibility issues associated with implementation of Alternative 2, other than obtaining access agreements for monitoring well installation. Implementation of Alternatives 3 and 4 would require acquisition of property and/or easements for the construction of extraction wells, treatment facilities, and conveyance facilities. In addition, implementing Alternatives 3 and 4 would require resolution of the following administrative issues associated with groundwater extraction and discharge of treated water to local water purveyors or to the Rio Hondo:

- Agreements may need to be made with the Watermaster or with a water purveyor to account for extraction from the basin by the parties implementing the selected remedy because these parties may not have water rights.

- An agreement with the Watermaster may be required regarding the potential need to pay replacement water fees for treated water discharged to the Rio Hondo, if the discharged water does not recharge within the Main San Gabriel Valley basin.

- Agreements would need to be reached with water purveyors that would receive treated water from the groundwater treatment facilities. These agreements will need to address the amount of water each purveyor would accept, the treated water delivery location, responsibility for any necessary capital improvements to purveyor systems, and other operational, liability, and financial arrangements.

- Water purveyors would need to obtain approval for modifications to their water supply permits.

- If treated water is discharged to the Rio Hondo, RWQCB Basin Plan water quality objectives for Rio Hondo would need to be addressed. If the discharge exceeds Basin Plan inorganic water quality objectives, it may be necessary to conduct an evaluation of the impact of the discharge on downgradient surface water and groundwater, as well as an evaluation of reuse alternatives for the VOC-treated groundwater. If water quality impacts are minimal and reuse alternatives infeasible, the discharge may be allowed.

**Availability of Services and Materials.** Implementation of Alternatives 3 and 4 would require fabrication of treatment plant equipment. Required services and materials are believed to be available, including qualified contractors for construction and operation of the necessary facilities.

Alternative 2 is assigned a higher ranking in Figure 4 because there are no significant issues that could impact implementability of this monitoring-only alternative. Alternatives 3 and 4 are ranked lower because of the administrative issues associated with groundwater extraction and treated water discharge.

## 10.7   Cost

This criterion addresses the total cost of each alternative. This includes short-term and long-term costs, and capital and O&M costs. The following cost elements are considered for each alternative:

- **Capital Cost.** Direct capital cost includes the cost of construction, labor, equipment, land, site development, and service. Indirect capital cost includes engineering fees, license and permit cost, startup and shakedown costs, and contingencies.

- **O&M Cost.** Annual O&M cost includes operating labor cost, maintenance materials and labor, pumping and treatment energy costs, monitoring costs, and all other post-construction costs necessary to ensure continuous effective operation of the alternative.

82

**Total Present Worth.** The total present worth of each alternative is calculated at a discount rate of 7 percent and a time period of 30 years. Total present worth for each alternative includes capital cost plus the present worth of the annual O&M costs.

The cost estimates are considered order-of-magnitude level estimates (i.e., the cost estimates have an expected accuracy of +50 to -30 percent). The assumption of a 30-year operating period is based on EPA guidance and does not reflect any specific finding regarding the duration of the selected remedy.

### 10.7.1  Cost: Evaluation of Alternatives

Although there is no cost presented for the no-action alternative (Alternative 1), there have been and would continue to be substantial financial impacts on local water purveyors or their rate payers because of the continued migration of contamination to their production wells. Table 5 summarizes the estimated costs for Alternatives 2 through 4.

### 10.7.2  Cost: Comparison of Alternatives

Table 5 compares the cost of each alternative for capital costs, long-term O&M costs, and present worth. The short-term capital costs range from $450,000 for Alternative 2 to $6,292,000 for Alternative 4. The annual O&M costs range from $90,000 for Alternative 2 to $1,130,000 for Alternative 4. The present worth costs range from $1,540,000 for Alternative 2 to $18,109,000 for Alternative 4. Table 5 presents two costs, assuming use of either new or existing facilities. The costs for Alternatives 3 and 4 are higher than those presented in the FS because of the facilities associated with the additional western extraction included in the modified Alternative 3 (as described in Section 14).

## 10.8  State Acceptance

The State of California has provided comments and feedback to EPA throughout the RI/FS process for the South El Monte OU. In a letter dated September 25, 2000, the California Department of Toxic Substance Control (DTSC), as lead agency for the state, concurred with EPA's selected remedy. In addition, the RWQCB concurred with EPA's selected remedy in a letter dated September 12, 2000.

## 10.9  Community Acceptance

EPA received written comments on the Proposed Plan from numerous individuals, representatives of PRP companies, and other local stakeholders. EPA responded directly to the oral questions at the public meeting held in October 1999. All of the written comments received during the 60-day public comment period, along with EPA's responses to them, are presented in the Responsiveness Summary in Part III of this ROD. The transcript for the public meeting is available at EPA's Superfund Records Center at EPA's Regional Office in San Francisco, and locally at two information repositories: the West Covina Library and the Rosemead Library.

Several of the commenters stated their preference for Alternative 4 rather than EPA's preferred Alternative 3. However, by far the majority of the comments submitted to EPA expressed support for EPA's selection of Alternative 3. EPA does not believe that the additional contaminant removal provided by the Alternative 4 shallow zone source control justify the additional costs of this alternative. EPA's conclusion is that Alternative 3 (the preferred alternative) represents the most appropriate interim remedy for the South El Monte OU. None of the comments received warranted a change to the proposed remedy.

# 11   Selected Remedy

After considering CERCLA's statutory requirements, the detailed comparison of the alternatives using the nine evaluation criteria, and public comments, EPA, in consultation with the State of California, has determined that the most appropriate remedy for this site is Alternative 3: intermediate zone control in western South El Monte OU. As described in Section 14 - Documentation of Significant Changes, the selected remedy is a slightly modified version of Alternative 3 presented in the FS and Proposed Plan. The performance standards and basic components of the selected remedy match those presented in the Proposed Plan and FS for Alternative 3, however, more facilities (e.g., extraction wells and treatment plants) will be required and the associated costs will be higher than previously assumed.

## Summary of Rationale for the Selected Remedy

Alternatives 1 and 2 provide the least overall protection of human health and the environment and do not fully comply with State and Federal requirements (ARARs). Considered in conjunction with EPA's Whittier Narrows OU remedy, Alternatives 3 and 4 both satisfy the remedial action objectives and satisfactorily meet the threshold criteria of overall protection of human health and the environment and compliance with State and Federal requirements. Alternatives 3 and 4 both address western intermediate zone contamination in the South El Monte OU. The intermediate zone contamination in the western portion of the South El Monte OU has impacted several production wells and EPA believes that controlling further contaminant migration in the intermediate zone is critical. Because the Whittier Narrows OU remedy will provide containment at the southern boundary of the contamination, the benefit of the additional shallow zone control provided by Alternative 4 would be to enhance mass removal, rather than migration control. However, Alternative 4 costs much more than Alternative 3 (see Table 5). For this containment remedy, EPA does not believe that additional mass removal benefits provided from the Alternative 4 shallow zone source control justify the additional cost.

The selected remedy, Alternative 3, meets the two Superfund threshold evaluation criteria, overall protection of human health and the environment and compliance with ARARs, and provides the best balance of the remaining Superfund evaluation criteria. EPA expects that this interim remedy will provide the basis for the final remedy for the South El Monte OU.

The selected remedy is an interim action and is focused on controlling the migration of contamination. Additional remediation may be needed to clean up VOC contamination remaining in the groundwater. EPA will use information collected during operation of the selected remedy to help determine the need for additional actions. Additional actions may also be required if facility-specific cleanup or source control actions in the South El Monte OU are not progressing as expected.

## 11.1   Description of the Selected Remedy

The selected remedy will be implemented using a performance-based approach. The performance-based approach specifies criteria ("performance criteria") that must be met while allowing flexibility in implementation. The performance criteria described below are designed to attain the RAOs for the South El Monte OU.

The selected remedy addresses the intermediate zone groundwater contamination present in the north-western half of the South El Monte OU. For purposes of describing the remedy, this contamination has been separated into two areas: 1) the central area of intermediate zone contamination and 2) the western area of intermediate zone contamination.

84

The central area of intermediate zone contamination refers to the contamination located in the vicinity of Monterey Park's (MP) production wells 12 and 15 (planned) and the San Gabriel Valley Water Company (SGVWC) Plant 8 wells (8A through 8F). Figures 3 and 5 show the intermediate zone contamination and the locations of these production wells in this area. This area contains the contamination that the original version of Alternative No. 3, presented in the FS and the Proposed Plan, was designed to contain.

The western area of intermediate zone groundwater contamination refers to the recently discovered intermediate zone contamination downgradient (west) of Monterey Park well No. 12 in the vicinity of the Southern California Water Company (SCWC) wells San Gabriel 1 and 2, Garvey 1 and 2, and Earle 1 and additional Monterey Park wells 1, 3, 5, 6, 10 and Fern. Figures 3 and 5 show the intermediate zone contamination and the locations of the production wells in this area.

## 11.1.1 Performance Criteria for the Intermediate Zone

*The remedial action shall provide sufficient hydraulic control to prevent migration of intermediate zone groundwater contaminated above chemical-specific ARARs into or beyond the Central Containment Area and into or beyond the Western Containment Area (defined in Section 11.1.3.2).*

Compliance with this criterion will be verified through monitoring of compliance wells for two parameters: hydraulic control and chemical specific ARARs. Wells to be used for monitoring compliance with chemical-specific criteria should be completed with screen lengths of 20 feet or less within the intermediate zone. Larger screened intervals may be appropriate for wells used to monitor compliance with hydraulic control requirements.

The remedial action must create inward hydraulic gradients at each of the Containment Areas. These hydraulic gradients must be sufficient to demonstrate that contaminated groundwater is captured by the extraction wells under all flow conditions (e.g., during both wet and dry periods in the hydrologic cycle).

Implementation of the remedial action cannot result in any adverse effects (i.e., increases in migration of contamination) to production wells that are not part of the remedial action. In addition, the remedial action must provide the required capture of contamination above chemical-specific ARARs without relying on the effects of wells that are not part of the remedial action.

Extracted intermediate zone groundwater will be treated by air stripping (with off-gas controls) or liquid-phase carbon adsorption. If alternative treatment technologies are identified, EPA will evaluate the alternative in accordance with the criteria specified in 40 C.F.R. Section 300.430 during remedial design.

## 11.1.2 Compliance with Performance Criteria

Compliance with the performance criteria will be confirmed by quarterly sampling and water level monitoring at compliance wells. In the future, if monitoring data demonstrate that the performance criteria are unlikely to be violated in the short term, monitoring intervals may be lengthened. If it appears, based on trends in monitoring data, that the performance criteria are close to being violated, monitoring intervals may be shortened.

In the Central Containment Area, compliance with the performance criteria will initially be determined through monitoring of hydraulic gradients. After hydraulic containment has been achieved and contaminant concentrations downgradient from extraction wells have dropped below ARARs, the monitoring program will be expanded to include monitoring of compliance with chemical-specific ARARs at downgradient wells.

In the Western Containment Area, compliance with the performance criteria will be determined through monitoring of hydraulic gradients and chemical-specific ARARs. Contaminant concentrations in downgradient compliance wells must meet chemical-specific criteria at all times.

In both Containment Areas, EPA expects that groundwater containment actions will be implemented sufficiently upgradient of the chemical-specific compliance wells to provide a buffer zone to allow additional actions to be taken, if necessary, to ensure compliance, but close enough to ensure that groundwater contamination is being contained. Imminent exceedance of the performance criteria at compliance wells indicates that groundwater contamination is continuing to migrate and improved hydraulic containment is required. Additional requirements for compliance wells are included in Section 11.1.3.4.

## 11.1.3  Supplemental Explanation of Performance Criteria

The following paragraphs provide additional explanation of the performance criteria.

### 11.1.3.1  The "Intermediate" Zone

The "intermediate" zone is a term intended to describe a general horizon within the aquifer underlying the South El Monte OU. During the course of the RI and development of the FS, the complex stratigraphy was simplified with generalizing assumptions about vertical intervals that appear to have similar characteristics throughout the area. However, actual subsurface conditions are not accurately described by terms that imply a consistent, well-layered system. The alluvial materials that underlie the South El Monte OU are heterogeneous and are made up of interfingering lenses of variable hydraulic properties.

The intermediate zone encompasses the coarser interval of the aquifer found beneath the shallow zone and the separating sequence. The shallow zone and separating sequence generally extend across the upper 200 feet of the subsurface, plus or minus 50 feet. The separating sequence is comprised of finer-grained materials that limit the vertical movement of groundwater between the shallow zone and intermediate zone. The intermediate zone is used extensively for groundwater production and generally extends across the first 200 to 300 feet of the aquifer beneath the separating sequence. In the context of this remedy, the intermediate zone extends to the deepest depths where groundwater contamination exceeds chemical-specific ARARs. In general, this is the upper 450 feet below ground surface. However, there may be isolated exceedances deeper in the aquifer. The terms shallow zone, separating sequence and intermediate zone are used in a manner consistent with their usage in the South El Monte OU Final Remedial Investigation and Feasibility Study Reports (Geosystem Consultants, 1998 and 1999, respectively).

### 11.1.3.2  Central and Western Containment Areas

The Central Containment Area includes production wells owned by the City of Monterey Park and the San Gabriel Valley Water Company. Intermediate zone groundwater contamination currently extends into and beyond the Central Containment Area. EPA's objective in this portion of the intermediate zone is to ensure that contamination is contained within the Central Containment Area. For purposes of this remedial action, the Central Containment Area is defined as: (1) the area encompassed by five Monterey Park wells (Nos. 7, 8, 9, 12, and 15 (planned)) and six San Gabriel Valley Water Company Plant 8 wells (Nos. 8A, 8B, 8C, 8D, 8E, 8F), and (2) the intermediate zone groundwater contaminated above ARARs that is present within 1,500 feet downgradient of these wells. The remedial action must contain all intermediate zone groundwater contamination that is migrating into the Central Containment Area.

The Western Containment Area contains production wells owned by the City of Monterey Park and Southern California Water Company. Intermediate zone groundwater contamination currently extends into the Western Containment Area. EPA's objective in this portion of the intermediate zone is to ensure that contamination does not migrate beyond the Western Containment Area. For the purposes of this remedial action, the Western Containment Area is defined as: (1) the area encompassed by the five Southern California Water Company wells (wells San Gabriel 1 and 2, Garvey 1 and 2, and Earle 1) and six Monterey Park wells (wells 1, 3, 5, 6, 10, and Fern), and (2) the extent of intermediate zone

groundwater contamination above ARARs in the vicinity of these wells. The remedial action must not allow intermediate zone groundwater contamination to spread beyond its current extent.

There are two approaches that appear to meet the performance criteria for each of the Containment Areas. The first relies exclusively on installation of new extraction wells upgradient of the existing production wells. These new wells would have to provide sufficient hydraulic control to capture contamination before it migrates into the production field. Under this scenario, compliance with the performance criteria will be determined at, or upgradient from, the production wells.

The second approach incorporates the production wells into the remedial action. If this second approach is used, it must be demonstrated that pumping from the production wells alone, or in combination with new wells, provides sufficient hydraulic control to meet the performance criteria. For the production wells to be considered as part of the remedial action, the responsible parties will have to provide assurances that the wells will operate in a manner that will ensure compliance with the performance criteria.

### 11.1.3.3  Compliance Wells

For any remedial approach, compliance will be monitored at wells located downgradient of each Containment Area. If a new extraction system is used in either Containment Area, compliance wells will also be placed at, or upgradient from, that Containment Area's production wells.

Compliance wells in the intermediate zone will be located within 2,000 feet of the area where extraction is occurring. Compliance well screens will generally be 20 feet or less. Concentrations in wells can vary as a function of screen length because of blending. Therefore, wells with screens longer than 20 feet are not generally considered appropriate for monitoring compliance with chemical-specific standards. However, longer-screened intervals may be appropriate for wells used strictly to evaluate compliance with hydraulic control requirements.

#### Central Containment Area

In the Central Containment Area, compliance with performance criteria will initially be determined through monitoring of hydraulic gradients. Compliance wells will be located sufficiently close to the extraction locations to be capable of ensuring compliance with hydraulic control requirements. Water quality data from these wells will also be used to confirm that hydraulic control requirements are being met. After hydraulic containment has been achieved and contaminant concentrations downgradient from the extraction wells have dropped below ARARs, the monitoring program will be expanded to include monitoring of compliance with chemical-specific ARARs. Wells used to measure compliance with chemical-specific ARARs will be located downgradient of the area with groundwater contamination exceeding ARARs.

#### Western Containment Area

In the Western Containment Area, compliance with the performance criteria will be determined through monitoring of hydraulic gradients and chemical-specific ARARs. As with the Central Containment Area, wells used to measure compliance with chemical-specific ARARs will be located downgradient of the area with groundwater contamination exceeding ARARs. Wells used to monitor hydraulic control will be located sufficiently close to the extraction locations to be capable of ensuring compliance with hydraulic control requirements. Compliance wells must be sufficient in number and adequately located to ensure that contamination above ARARs does not migrate beyond the Western Containment Area.

### 11.1.3.4  Adverse Effects

The term "adverse effects" is included in the performance criteria to prevent the design and installation of a hydraulic control system that maintains concentrations at compliance wells below specified thresholds at the expense of production wells that are not part of the remedy. The principal adverse effect of concern is implementation of the remedial action in a manner that results in increased contaminant concentrations in existing production wells that are not part of the remedial action. This requirement

prevents, for example, the installation of new extraction wells immediately upgradient of the compliance wells and downgradient of production wells that are not part of the remedial action. The hydraulic control system must be protective of the environment and not result in adverse effects on production wells or allow continued spread of groundwater contamination.

# 11.2  Summary of the Estimated Remedy Costs

A detailed breakdown of the estimated capital, operating and maintenance (O&M), and present worth costs associated with the selected remedy is included in Table 7. The specific facilities assumed for estimating the costs of each of the remedy components are as follows (the actual number, size and location of facilities will be determined during remedial design):

- Groundwater Extraction- Installation of three new extraction wells in the Central Containment Area and three new extraction wells in the Western Containment Area to provide containment. An average total extraction rate of 10,000 gpm is assumed.

- Groundwater Treatment- Installation of wellhead treatment facilities at four locations (two in the Central Containment Area and two in the Western Containment Area). These facilities consist of air strippers with VGAC treatment of the off-gas. Treatment is assumed to remove contaminant concentrations to less than 50% of the chemical-specific criteria.

- End Use of Treated Groundwater- Conveyance pipelines to existing water purveyor facilities in the Central Containment Area and the Western Containment Area.

- Groundwater Monitoring- Installation of two additional multiport monitoring wells and implementation of a long-term monitoring program.

The present worth cost estimates assume a 7 percent (%) discount rate and a 30 year project duration. These cost estimates are expected to be accurate within +50 to –30%. The total estimated capital costs are $5.88 million. The estimated annual O&M costs are $0.84 million and the total present worth cost estimate is $14.1 million. These costs assume land acquisition and installation of new facilities. However, there are existing water purveyor facilities, including land, pumps, wells, and pipelines, that could be incorporated into the remedy. If agreements can be reached to use these existing facilities in place of installing new facilities, the estimated capital costs (and the present worth cost) of the remedy would go down by approximately $2.22 million. Under this scenario, the total estimated capital costs are $3.66 million, and the estimated present worth cost of the remedy is $11.9 million.

These cost estimates assume that the treated water is delivered to water purveyors and that these purveyors pay $45 per acre-foot for the water they receive. This reimbursement rate is an estimate of the purveyor's "avoided cost" of pumping the water from the ground and pressurizing it for delivery to their distribution system. Incorporating this reimbursement rate into the estimate of annual O&M reduces the estimated annual O&M costs by $0.73 million. If the necessary agreements cannot be reached to deliver water to purveyors, annual O&M costs would increase by $0.73 million.

The cost estimates also assume that the containment systems in the Western Containment Area would not need to operate as long as the systems in the Central Containment Area. The Central Containment Area cost estimate assumes an operating life of 30 years. Based on the groundwater modeling evaluations described in Section 14, it is assumed that one of the systems in the Western Containment Area would operate for 10 years and the other one for 5 years. However, it is difficult to predict the actual length of time that these systems will need to operate. If both systems only operated for 5 years, the total present worth cost estimate would drop to $13.7 million. If both systems had to operate for as long as 15 years, the present worth cost estimate would increase to $15.3 million.

88

## 11.3  Expected Outcomes of the Selected Remedy

Once implemented, this remedy will protect the existing beneficial uses of the currently uncontaminated aquifer downgradient of the compliance wells. The remedy will allow for continued use of the downgradient areas as a source of drinking water supply. It will also ensure that existing and planned production wells in the Central and Western Containment areas of the OU are protected.

Because the interim remedial action selected in this ROD is for containment and not restoration, no final cleanup standards have been established for restoration of groundwater. This means that at least a portion of aquifer (both the shallow and intermediate zones) upgradient of the compliance wells and associated extraction systems is expected to remain contaminated and unusable for a considerable length of time.

89

# 12 Applicable or Relevant and Appropriate Requirements (ARARs)

Section 121(d) of CERCLA, 42 U.S.C. § 9621(d) requires that remedial actions at CERCLA sites attain (or justify the waiver of) any federal or state environmental standards, requirements, criteria, or limitations that are determined to be legally applicable or relevant and appropriate. These applicable or relevant and appropriate requirements are referred to as "ARARs." Federal ARARs may include requirements promulgated under any federal environmental laws. State ARARs may only include promulgated, enforceable environmental or facility-siting laws of general application that are more stringent or broader in scope than federal requirements and that are identified by the state in a timely manner.

An ARAR may be either "applicable," or "relevant and appropriate," but not both. If there is no specific federal or state ARAR for a particular chemical or remedial action, or if the existing ARARs are not considered sufficiently protective, then other guidance or criteria to be considered (TBCs) may be identified and used to ensure the protection of public health and the environment. The NCP, 40 C.F.R. Part 300, defines "applicable," "relevant and appropriate," and "to be considered" as follows:

- Applicable requirements are those cleanup standards, standards of control, or other substantive requirements, criteria, or limitations promulgated under federal environmental or state environmental or facility siting laws that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstances found at a CERCLA site. Only those state standards that are identified by a state in a timely manner and that are more stringent than federal requirements may be applicable.

- Relevant and appropriate requirements are those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or state environmental or facility siting laws that, while not "applicable" to a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance at a CERCLA site, address problems or situations sufficiently similar to those encountered at the CERCLA site that their use is well suited to the particular site. Only those state standards that are identified in a timely manner and that are more stringent than federal requirements may be relevant and appropriate.

- TBCs consist of advisories, criteria, or guidance that EPA, other federal agencies, or states developed that may be useful in developing CERCLA remedies. The TBC values and guidelines may be used as EPA deems appropriate.

ARARs are identified on a site-specific basis from information about the chemicals at the site, the remedial actions contemplated, the physical characteristics of the site, and other appropriate factors. ARARs include only substantive, not administrative, requirements, and pertain only to onsite activities. Offsite activities must comply with all applicable federal, state, and local laws, including both substantive and administrative requirements, that are in effect when the activity takes place. There are three general categories of ARARs:

- Chemical-specific ARARs are health- or risk-based concentration limits, numerical values, or methodologies for various environmental media (i.e., groundwater, surface water, air, and soil) that are established for a specific chemical that may be present in a specific media at the site, or that may be discharged to the site during remedial activities. These ARARs set limits on concentrations of specific hazardous substances, pollutants, and contaminants in the environment. Examples of this type of ARAR include state and federal drinking water standards.

II-12-1

- Location-specific ARARs set restrictions on certain types of activities based on site characteristics. Federal and state location-specific ARARs are restrictions placed on the concentration of a contaminant or the activities to be conducted because they are in a specific location. Examples of special locations possibly requiring ARARs may include flood plains, wetlands, historic places, and sensitive ecosystems or habitats.

- Action-specific ARARs are technology- or activity-based requirements that are triggered by the type of remedial activities under consideration. Examples of this type of ARAR are RCRA regulations for waste treatment, storage, or disposal.

EPA has evaluated and identified the ARARs for the selected remedy in accordance with CERCLA, the NCP, and EPA guidance, including the CERCLA Compliance with Other Laws Manual, Part I (Interim Final), OSWER Directive 9234.1-01 (EPA, 1988a) and CERCLA Compliance with Other Laws Manual, Part II, OSWER Directive 9234.1-02 (EPA, 1989).

# 12.1 Chemical-Specific ARARs

The chemicals of potential concern for the South El Monte OU are compounds that have been detected in groundwater in the South El Monte OU. Table 6 lists these compounds and their chemical-specific ARARs.

## 12.1.1 Federal Drinking Water Standards

EPA has established MCLs, 40 C.F.R. Part 141, under the Safe Drinking Water Act (SDWA), 42 U.S.C. §§ 300f-j, to protect public health from contaminants that may be found in drinking water sources. MCLs are applicable at the tap for water that is delivered directly to 25 or more people or to 15 or more service connections.

Under the SDWA, EPA has also designated Maximum Contaminant Level Goals (MCLGs), 40 C.F.R. Part 141, which are health-based goals that may be more stringent than MCLs. MCLGs are set at levels, including an adequate margin of safety, where no known or anticipated adverse health effects would occur. MCLGs greater than zero are relevant and appropriate where multiple contaminants in groundwater or multiple pathways of exposure present unacceptable health risks (EPA, 1988b). One chemical detected in the South El Monte OU groundwater, 1,1,2-trichloroethane, has a non-zero MCLG that is more stringent than its MCL.

Under Section 300.430(f)(5) of the NCP, remedial actions must generally attain MCLs and nonzero MCLGs if the contaminated water is a current or potential source of drinking water. The 1995 Water Quality Control Plan for the Los Angeles Region (Basin Plan) designates all of the contaminated groundwater in the South El Monte OU as current and potential sources of drinking water. However, since this ROD selects an interim remedial action to contain contaminant migration, no final cleanup standards are established for the restoration of groundwater. Final cleanup standards will be established in a Final ROD. For this interim ROD, EPA has determined that the federal MCLs and nonzero MCLGs listed in Table 6 are ARARs for any groundwater that is extracted and used for domestic, municipal, industrial, or agricultural purposes, and for any groundwater that is discharged to the environment. In addition, these MCLs and MCLGs are ARARs for currently uncontaminated groundwater in the intermediate zone downgradient of the existing compliance wells established by the remedial action (EPA, 1988a).

If treated groundwater is to be delivered into a public water supply, all legal requirements for drinking water in existence at the time that the water is served will have to be met because EPA considers the service of water to the public to be an offsite activity.

91

### 12.1.2 California Drinking Water Standards

California has established state MCLs for sources of public drinking water, under the California Safe Drinking Water Act of 1976, Health and Safety Code (H&SC) §§ 4010.1 and 4026(c), California Code of Regulations (CCR) Title 22, §§ 64431 and 64444. Some state MCLs are more stringent than the corresponding federal MCLs. EPA has determined that the more stringent state MCLs are relevant and appropriate for the South El Monte OU. There are also some chemicals that lack federal MCLs. Where state MCLs exist for chemicals that lack federal MCLs, EPA has determined that the state MCLs are relevant and appropriate for the South El Monte OU. State MCLs apply to remedial actions in the South El Monte OU in the same manner as federal MCLs. Table 6 identifies the state MCLs that are ARARs for this remedial action.

If contaminants not listed in Table 6 are detected during implementation of the remedy, their state or federal MCLs (or non-zero MCLGs), whichever is lower, shall be ARARs for containment and treatment of the groundwater. If a contaminant is detected that does not have established MCLs or MCLGs (e.g., 1,4-dioxane), EPA will evaluate available standards and information, such as California Department of Health Services drinking water action levels, to identify a relevant and appropriate standard for the contaminant.

## 12.2 Location-Specific ARARs

This ROD specifies performance criteria for the remedy. As such, the locations of remediation facilities (e.g., wells, treatment plants, and pipelines) are not specifically identified herein. Locations of remediation facilities will be determined during the remedial design, and will conform to the location-specific ARARs identified below.

### 12.2.1 Location Standards for TSD Facilities

California Code of Regulations, Title 22, Section 66264.18 establishes location standards for Hazardous Waste Treatment, Storage, and Disposal Facilities (TSDFs). Subsection 66264.18(a) prohibits the placement of TSDFs within 200 feet of a fault displaced during the Holocene epoch. Subsection 66264.18(b) requires that TSDFs located within a 100-year flood plain be capable of withstanding a 100-year flood. These standards are applicable to the construction of any new groundwater extraction and treatment facilities used as part of this remedial action.

### 12.2.2 Endangered Species Act

The Endangered Species Act, 15 U.S.C. §§ 1531-1544, and implementing regulations, 40 C.F.R. § 6.302(h), 50 C.F.R. Parts 17, 222 and 402, are applicable to any remedial actions that impact a proposed or listed threatened or endangered species or destroy or adversely modify the critical habitat of a listed species. No endangered species are known or suspected to occur in the locations where remedial action facilities might be constructed. If, however, it appears during the implementation of the remedial action that construction activities or the discharge of treated groundwater might adversely affect a proposed or listed species, EPA will consult with the U.S. Fish and Wildlife Service (FWS) in accordance with 50 C.F.R. Part 402 and ensure that regulatory requirements are followed so that adverse impacts are avoided or mitigated.

### 12.2.3 California Fish and Game Code

California Fish and Game Code sections 2080, 5650(a), (b), and (f), 12015, and 12016 prohibit the discharge of harmful quantities of hazardous materials into places that may deleteriously affect fish, wildlife, or plant life. These provisions are applicable if the remedial action will result in the discharge of treated groundwater to surface waters.

### 12.2.4  National Historic Preservation Act

The National Historic Preservation Act and implementing regulations (16 U.S.C. § 470, 40 C.F.R. Part 6.301(b), 36 C.F.R. Part 800) require federal agencies or federal projects to take into account the effect of any federally assisted undertaking or licensing on any district, site, building, structure, or object that is included in, or eligible for, the Register of Historic Places. If remedial action is likely to have an adverse effect on any cultural resources that are on or near the South El Monte OU, EPA will examine whether feasible alternative. exist that would avoid such effects. If effects cannot reasonably be avoided, measures will be implemented to minimize or mitigate the potential effect.

No cultural resources are anticipated in the vicinity of facilities for this remedial action. However, during preliminary design, a complete review of all impacted areas will be made.

### 12.2.5  Archaeological and Historic Preservation Act

This statute and implementing regulations, 16 U.S.C. § 469, 40 C.F.R. Part 6.301(c), establish requirements for the evaluation and preservation of historical and archaeological data that may be destroyed through alteration of terrain as a result of a federal construction project or a federally licensed activity or program. No sites of historical interest are anticipated in the vicinity of facilities for this remedial action. However, during preliminary design, a complete review will be made of impacted areas.

### 12.2.6  Historic Sites, Buildings, and Antiquities Act

The Historic Sites, Buildings, and Antiquities Act, 16 U.S.C. §§ 461-467, 40 C.F.R. Part 6.301(a), requires federal agencies to consider the existence and location of landmarks on the National Registry of Natural Landmarks to avoid undesirable impacts on such landmarks. The remedial action is not anticipated to affect any of the facilities regulated under the act. However, during preliminary design, a complete review will be made of impacted areas.

## 12.3  Action-Specific ARARs

### 12.3.1  Local Air Quality Management

One VOC treatment technology that may be used is air stripping. Air emissions from air strippers are regulated by the California Air Resources Board, which implements the federal Clean Air Act (CAA), as well as the air pollution control requirements of the California H&SC, through local air quality management districts. Local districts may impose additional regulations to address local air emission concerns. The local air district for the South El Monte OU is the South Coast Air Quality Management District (SCAQMD). The SCAQMD has adopted several rules that are ARARs for air stripper emissions and construction activities.

SCAQMD Regulation XIII, comprising Rules 1301 through 1313, establishes new source review requirements. Rule 1303 requires that all new sources of air pollution in the district use best available control technology (BACT) and meet appropriate offset requirements. Emissions offsets are required for all new sources that emit in excess of one pound per day.

SCAQMD Rule 1401 requires that best available control technology for toxics (T-BACT) be employed for new stationary operating equipment, so that the cumulative carcinogenic impact from air toxics does not exceed the maximum individual cancer risk limit of 10 in 1 million (1 x 10-5). Many of the contaminants found in the South El Monte OU groundwater are air toxics subject to Rule 1401.

SCAQMD Rules 401 through 403 are also ARARs for construction and operation of remedial action facilities. SCAQMD Rule 401 limits visible emissions from a point source. Rule 402 prohibits discharge

93

of material that is odorous or causes injury, nuisance, or annoyance to the public. Rule 403 limits downwind particulate concentrations.

## 12.3.2 Federal Clean Water Act and California Porter-Cologne Water Quality Act

California's Porter-Cologne Water Quality Act incorporates the requirements of the federal Clean Water Act (CWA) and implements additional standards and requirements for surface and groundwaters of the state.

### 12.3.2.1 Water Quality Control Plan for the Los Angeles Region (Basin Plan)

The RWQCB formulates and enforces water quality standards through a Basin Plan. The Basin Plan identifies the beneficial uses of surface and groundwaters in the San Gabriel River watershed and establishes water quality objectives necessary to protect these beneficial uses. Water quality objectives impose limitations on receiving waters, rather than discharges, and are applicable to any water body that receives discharge from remedial activities in the South El Monte OU.

The selected remedial action could result in the discharge of treated groundwater to the Rio Hondo. Table 2-1 of the Basin Plan identifies the following beneficial uses for the Rio Hondo above the Rio Hondo Spreading Grounds:

* Municipal and domestic supply (potential beneficial use)
* Groundwater recharge (intermittent beneficial use)
* Water contact recreation (intermittent beneficial use)
* Noncontact water recreation (existing beneficial use)
* Warm freshwater habitat (potential/intermittent beneficial use)
* Wildlife habitat (existing beneficial use)

Because municipal and domestic water supply is a potential beneficial use of these surface waters, Federal and State MCLs and MCLGs are water quality objectives for the Rio Hondo, except where the California Toxics Rule, 33 U.S.C. § 131.38 (below) imposes more stringent criteria. In addition, the following water quality objectives from the Basin Plan are ARARs for the Rio Hondo in the SEMOU vicinity:

* Total Dissolved Solids: 750 mg/L
* Sulfate: 300 mg/L
* Chloride: 150 mg/L
* Boron: 1.0 mg/L
* Nitrogen ($NO_3$-N + $NO_2$-N): 8 mg/L

The Basin Plan also establishes water quality objectives for groundwater in the Main San Gabriel Basin (Table 3-10). These water quality objectives are applicable as water quality objectives if the remedial action will result in a discharge that impacts groundwater.

### 12.3.2.2 California Toxics Rule

In May 2000, EPA established numeric criteria for priority toxic pollutants in California surface waters. As amended, 33 U.S.C. § 131.38 establishes water quality criteria for 126 pollutants, including many of the VOCs found in groundwater at the South El Monte OU. If it is determined that the remedial action will discharge treated groundwater to the Rio Hondo, EPA will use these water quality criteria to develop water quality-based effluent limitations for the discharge.

94

### 12.3.2.3   State Water Resources Control Board Resolution 68-16

The Basin Plan also incorporates the State Water Resources Control Board (SWRCB) policy "Statement of Policy with Respect to Maintaining High Water Quality in California" (Resolution 68-16). Resolution 68-16 requires that existing water quality be maintained unless it is demonstrated that a change will benefit the people of California, will not unreasonably affect present or potential uses, and will not result in water quality less than prescribed by other state policies. Any activity that may increase the volume or concentration of a waste discharged to surface or groundwater is required to use the "best practicable treatment or control."

Resolution 68-16 is applicable to discharges of treated groundwater. If treated water is to be discharged to the Rio Hondo, the RWQCB may require an evaluation of the potential impact of nitrate and TDS contained in treated groundwater on receiving waters and investigate alternative discharge options. If water quality impacts are minimal and alternative discharge options infeasible, the RWQCB may allow the discharge to the Rio Hondo.

### 12.3.2.4   State Water Resources Control Board Resolution 92-49

Subsection III.G of the SWRCB's "Policies and Procedures for Investigation and Cleanup and Abatement of Discharges under Water Code Section 13304" (Resolution 92-49) requires attainment of background water quality or, if background levels cannot be restored, the best quality of water that is reasonable. Resolution 92-49 is not an ARAR because this is an interim remedial action to contain the spread of contamination, rather than a final action to restore groundwater in the South El Monte OU.

### 12.3.2.5   Standards Applicable to CERCLA Section 104(b) Discharges to Surface Waters

Site investigation activities undertaken pursuant to CERCLA § 104(b) are considered to be removal actions. It is EPA policy that removal actions "comply with ARARs to the extent practicable, considering the exigencies of the circumstances." (55 Fed. Reg. 8756).

It is possible that certain site investigation activities will take place during remedial design, which will result in temporary high-flow, high-volume discharges of contaminated groundwater (e.g., discharges from aquifer testing of extraction wells). EPA has considered the best available technology economically achievable (BAT) for treatment and disposal of these discharges. The three disposal options that EPA considered are: (1) onsite storage and disposal at a Resource Conservation and Recovery Act (RCRA)-approved hazardous waste facility, (2) discharge to a sanitary sewer for treatment at a wastewater treatment plant, and (3) onsite treatment and discharge to surface water channels. EPA has concluded that compliance with chemical-specific ARARs is not practicable, considering the exigencies of the circumstances, for many temporary high-flow, high-volume discharges.

EPA has determined that compliance with chemical-specific ARARs is practicable and necessary for CERCLA § 104(b) activities that do not result in temporary high-flow, high-volume discharges. EPA will determine the application of chemical-specific ARARs to CERCLA § 104(b) activities on a case-by-case basis. Where practicable, these discharges must comply with ARARs.

## 12.3.3   California Hazardous Waste Management Program

The federal RCRA establishes requirements for the management and disposal of hazardous wastes. In lieu of the federal RCRA program, the State of California is authorized to enforce its Hazardous Waste Control Act, and implement regulations (CCR Title 22, Division 4.5), subject to the authority retained by EPA in accordance with the Hazardous and Solid Waste Amendments of 1984 (HSWA). California is responsible for permitting treatment, storage, and disposal facilities within its borders and carrying out

other aspects of the RCRA program. Some of the Title 22 regulations are applicable to the generation and disposal of hazardous wastes in the South El Monte OU.

### 12.3.3.1 Hazardous Waste Generator Requirements

CCR Title 22 establishes requirements applicable to generators of hazardous waste. Implementation of the remedial action may generate hazardous waste as a result of ground-water monitoring and well installation (e.g., contaminated soil and groundwater and used personal protective equipment). Hazardous waste may also be generated as a result of ground-water treatment to remove VOCs (e.g., spent carbon). These requirements are applicable to remedial actions in the South El Monte OU.

The preamble to the NCP clarifies that when noncontiguous facilities are treated as one site, the movement of hazardous waste from one facility to another is subject to RCRA manifest requirements (55 Fed. Reg. 8691). Manifest requirements are ARARs in the event that the remedial action involve multiple water treatment units at different locations and require the movement of hazardous wastes (e.g., spent carbon) between these locations.

### 12.3.3.2 Land Disposal Restrictions

CCR Title 22 defines hazardous wastes that cannot be disposed of to land without treatment. Land disposal requirements are applicable to the disposal of spent carbon generated during the treatment of groundwater for removal of VOCs, if carbon adsorption is used, and the disposal of residuals associated with groundwater monitoring and well installation (e.g., contaminated soil and groundwater, used personal protective equipment).

### 12.3.3.3 Hazardous Waste TSD Facility Requirements

CCR Title 22, Division 4.5, Chapter 14, specifies Hazardous Waste TSDF requirements that regulate the design, construction, operation, and closure of RCRA-permitted TSDFs. Since the contaminated groundwater is sufficiently similar to RCRA hazardous wastes, Title 22 TSDF requirements are relevant and appropriate for the design, construction, operation, and closure of any ground-water treatment systems. The Title 22 ARARs include the substantive requirements of the following provisions:

- Section 66264.14: Security Requirements
- Section 66264.25: Seismic and Precipitation Standards
- Section 66264.94: Groundwater Protection Standards
- Sections 66264.111-115: Closure of Treatment Units
- Sections 66264.170-178: Use and Management of Containers
- Sections 66264.600-603: Standards for Miscellaneous Treatment Units

## 12.4    ARARs Waivers

This interim remedial action shall comply with all ARARs described in this section. Because this is an interim action for containment of groundwater contamination, EPA has not established chemical-specific ARARs for restoration of groundwater remaining onsite. These ARARs will be addressed in the Final ROD for the South El Monte OU.

# 13   Statutory Determinations

Under CERCLA Section 121, EPA must select remedies that are protective of human health and the environment, comply with applicable or relevant and appropriate requirements (unless a statutory waiver is justified), are cost-effective, and utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable. In addition, CERCLA includes a preference for remedies that employ, as a principal element, treatment that permanently and significantly reduces the volume, toxicity, or mobility of hazardous wastes. The following sections discuss how the selected remedy meets these statutory requirements.

## 13.1   Protection of Human Health and the Environment

The selected remedy (in conjunction with the interim remedial action in the downgradient Whittier Narrows OU) will protect human health and the environment by limiting further downgradient migration of contaminated groundwater and preventing the existing groundwater contamination from impacting current groundwater users. The remedy will also remove contaminant mass from the aquifer. The selected remedy will reduce potential risks by decreasing the likelihood and magnitude of future exposure to contaminated groundwater. Contaminant concentrations in the groundwater in the areas to be addressed by the remedy are currently well above acceptable levels. Available treatment technologies are technically feasible and proven effective in meeting ARARs for VOCs in the treated groundwater and air. Implementation of the remedy will not pose unacceptable short-term risks. In addition, no adverse cross-media impacts are expected.

## 13.2   Compliance with ARARs

The selected remedy shall comply with all ARARs described in Section 12 of this interim ROD. Because this is an interim action for the containment of groundwater contamination, EPA has not established chemical-specific ARARs for restoration of groundwater.

## 13.3   Cost-Effectiveness

EPA believes the selected remedy is cost-effective for addressing migration of contaminated groundwater in the South El Monte OU. Section 300.430(f)(ii)(D) of the NCP requires EPA to determine cost-effectiveness by evaluating the cost of an alternative relative to its overall effectiveness. Effectiveness is defined by three of the five balancing criteria: long-term effectiveness, short-term effectiveness, and reduction of toxicity, mobility and volume through treatment. The overall effectiveness is then compared to cost to ensure that the selected remedy is cost-effective.

The estimated present worth cost of the selected remedy is $14.1 million. The selected remedy is the lowest cost alternative that meets EPA's RAOs for the South El Monte OU. The less expensive groundwater-monitoring only alternative (Alternative 2) does not actively contain migration of groundwater contamination in the South El Monte OU.

## 13.4   Utilization of Permanent Solutions and Alternative Treatment Technologies to the Maximum Extent Practicable

As an interim remedial action, EPA has determined that the selected remedy represents the maximum extent to which permanent solutions and treatment technologies can be utilized in a practicable manner in the South El Monte OU. EPA has also determined that the selected remedy provides the best balance of

II-13-1

tradeoffs in terms of the five balancing criteria, while also considering the statutory preference for treatment as a principal element and considering state and community acceptance.

The selected remedy satisfies the long-term effectiveness criterion by removing VOC contamination from the groundwater and destroying the VOCs during carbon regeneration. Groundwater containment through extraction effectively reduces the mobility and volume of and potential for exposure to site-related contamination. The selected remedy does not present any short-term risks that can not be readily mitigated and EPA expects that the implementability issues associated with the selected remedy can be resolved in a timely manner.

## 13.5  Preference for Treatment as a Principal Element

By treating the contaminated groundwater through air stripping or liquid-phase carbon adsorption, the selected remedy addresses the site contamination through the use of treatment technologies. By using treatment as a component of the interim remedial action, the statutory preference for remedies that employ treatment as a principal element is supported.

## 13.6  Five-Year Reviews

Because the remedy will result in hazardous substances remaining onsite above levels that allow for unlimited use and unrestricted exposure, EPA shall conduct a review of the remedy at least once every 5 years after initiation of remedial action. The review will assess whether the remedy continues to provide adequate protection of human health and the environment. If it is determined that the remedy is no longer protective of human health and the environment, then modifications to the remedy will be evaluated and implemented as necessary.

# 14 Documentation of Significant Changes

The Proposed Plan for the South El Monte OU was released for public comment in September 1999. The Proposed Plan identified Alternative 3, Intermediate Zone Control in the Western South El Monte OU, as the Preferred Alternative for addressing groundwater contamination in the South El Monte OU. EPA received and reviewed a large number of written and verbal comments submitted during the public comment period. During this period, EPA was made aware of additional data on the extent of groundwater contamination in the intermediate zone in the western portion of the South El Monte OU. This data indicated that the intermediate zone groundwater contaminated in excess of MCLs had migrated further west than was depicted in the FS Report (Geosystem Consultants, 1999) and Proposed Plan. EPA confirmed the larger extent of intermediate zone contamination by installing and sampling two new multiport monitoring wells in the spring of 2000. Because of this migration, the western boundary of the South El Monte OU described as Walnut Grove Avenue in the Feasibility Study and Proposed Plan, has moved with the contamination to the vicinity of San Gabriel Boulevard.

Although the change in the extent of intermediate zone contamination does not require changes to the general structure of the preferred alternative, it does impact the locations and cost of the facilities that will be required to meet the RAOs. In the Proposed Plan, the preferred alternative only discussed the need for containment in the vicinity of the San Gabriel Valley Water Company (SGVWC) and Monterey Park well fields (referred to as the "Central Containment Area" in Section 11). The discovery of significant contamination downgradient of these locations required EPA to evaluate the potential need for additional downgradient containment to meet the migration control objectives of the remedy. To assess the magnitude and location of potential supplemental containment, EPA performed groundwater modeling simulations. The groundwater modeling results are described in a memorandum (EPA, 2000) and summarized below.

To develop a revised containment scenario, the extraction scenario simulated for Alternative No. 3 in the FS Report (Geosystem Consultants, 1999) was modified to include additional pumping further west (referred to as the "Western Containment Area" in Section 11) at the downgradient edge of the plume. In the modified containment scenario, consistent with the simulations performed for the FS, all of the extraction is provided by existing water purveyor wells. However, this containment could instead be provided by extraction from new wells located upgradient of the existing wells. The modified containment scenario simulation includes the following:

- Operation of existing production wells at close to maximum capacity on a continuous basis if they have wellhead treatment systems currently operating or if the water purveyors have plans to install wellhead treatment systems in the near future. These wells include Monterey Park's wells 5, 12 and 15; selected SGVWC Plant 8 (8B, 8C, and 8D) wells; and SCWC's San Gabriel 1 and 2 wells

- Operation of selected additional purveyor wells as necessary to meet peak demands or to maintain system pressures

- Sufficient extraction from existing production wells to match historic average annual production rates for each purveyor's system

- Operation of EPA's planned remedy in the Whittier Narrows OU.

The average extraction rates for each of the wells assumed to be operating as part of the modified Alternative No. 3 are summarized as follows:

99

| | |
|---|---|
| Monterey Park No. 5 well | 1,620 gpm |
| Monterey Park No. 12 and 15 wells | 4,050 gpm |
| SGVWC Plant 8 wells | 2,500 gpm |
| SCWC San Gabriel 1 and 2 wells | 1,850 gpm |
| TOTAL | 10,020 gpm |

It should be noted that the extraction rates simulated for the Monterey Park's No. 12 and 15 wells are higher than those used in the simulations for Alternative No. 3 performed for the South El Monte OU FS Report (Geosystem Consultants, 1999). Figure 5 shows the simulation results for the modified Alternative No. 3. The figure shows the simulated paths of groundwater particles within and around the interpreted area of VOC contamination in the intermediate zone of the South El Monte OU. The simulated particle tracks presented in Figure 5 confirm that the extraction wells included in the original Alternative No. 3 (i.e., Monterey Park Nos. 12 and 15; SGVWC's Plant 8 wells) provide containment of the upgradient (i.e., the "Central Area") intermediate zone contamination. These extraction wells would also capture some of the contamination that has migrated further downgradient. The remainder of the contamination that has migrated further downgradient (the "Western Area") beyond the capture zone of these wells can be contained by extraction from the Monterey Park No. 5 and the Southern California Water Company (SCWC) San Gabriel Nos. 1 and 2 wells.

These simulation results show that containment can be achieved using extraction from existing wells. As noted above, containment could also be achieved by using new wells installed upgradient of the existing wells. Two of the existing well clusters included in the modified Alternative No. 3 simulations were not included in the original Alternative No. 3 presented in the Proposed Plan. These are the Monterey Park No. 5 and SCWC San Gabriel Nos. 1 and 2 wells. Because these wells are located downgradient of the primary containment provided by the upgradient Monterey Park/SGVWC wells, they may not need to be operated for as long to provide containment of this downgradient contamination.

The length of time that the additional containment systems would need to operate has been estimated using groundwater velocities derived from the simulation illustrated in Figure 5. The simulated groundwater velocities in the downgradient western area are about 400 feet/year and suggest that all of the groundwater would be captured by Monterey Park well No. 5 within about 6 years. Because retardation of contaminants such as PCE likely occurs in the intermediate zone, the estimated time to remove the contamination from the intermediate aquifer would be longer, approximately 10 years. This assumes a retardation factor of 1.8, as was used in the FS Report (Geosystem Consultants, 1999). Less time should be required to remove the contamination migrating towards the SCWC San Gabriel 1 and 2 wells because these wells capture a smaller area of contamination. Using the groundwater velocity and retardation factor described above, the estimated operational time frame for the SCWC wells is 5 years. These estimates are based on a number of assumptions; the actual amount of time needed to operate the containment systems in the Western Containment Area could be considerably different. However, the times cited above provide an adequate basis for estimating costs.

Revised Remedy Costs

The estimated present worth cost of the modified Alternative No. 3, assuming use of all new facilities (i.e., none of the existing water purveyor wells, pumps, land or other facilities would be used in the containment systems), is $14.1 million (see Table 7). This cost estimate relies on all of the same cost assumptions and cost factors used in developing costs for Alternative No. 3 in the FS Report (Geosystem Consultants, 1999), and includes the costs of installing and operating additional facilities in the vicinity of Monterey Park No. 5 and SCWC San Gabriel Nos. 1 and 2. The cost estimate assumes that these facilities would need to operate for 10 and 5 years, respectively. The estimated present worth cost of the

modified Alternative No. 3 would be reduced to $11.9 million if it is assumed that existing facilities are
used (EPA 2000).

The actual amount of time that the supplemental containment systems for the Western Containment Area
would need to operate is uncertain. Accordingly, the actual costs of the remedy could be higher or lower
than those described above. For example, if both containment systems only needed to operate for 5 years,
the estimated cost of the remedy would be $13.7 million, rather than $14.1 million. Conversely, if both
wellhead treatment facilities had to operate for 15 years, the estimated cost of the remedy would increase
to $15.3 million (EPA 2000).